The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Mario ROMERO, Defendant–Appellee.

No. 97SA311.

Supreme Court of Colorado,
En Banc.

Jan. 26, 1998.

Robert L. Pastore, District Attorney, Twelfth Judicial District, Alamosa, Clemmie P. Engle, Senior Assistant Attorney General, Special Deputy District Attorney, Twelfth Judicial District, Denver, for Plaintiff–Appellant.

Comar & Wood, L.L.C., Peter L. Comar, Alamosa, for Defendant–Appellee.

Justice HOBBS delivered the Opinion of the Court.

In this interlocutory appeal under C.A.R. 4.1 and section 16–12–102(2), 6 C.R.S. (1997), the prosecution challenges an order of the Alamosa County District Court suppressing statements the defendant Mario Romero (Romero) made during custodial interrogation. The district court determined that police officers had delivered a proper advisement under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and had secured a written waiver of rights but improperly continued to question Romero after he requested the assistance of legal counsel within the meaning of *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). We agree with the district court that oral and written statements Romero made in response to police questions after he requested counsel must be suppressed.

## I.

On March 27, 1997, Romero was at home in Alamosa drinking large amounts of "Ken-

tucky Deluxe"—"three to six pints," he said—with his friend, Jesse Ortega (Ortega). Romero's pregnant wife and his children also were at home. A vehicle unexpectedly arrived in front of the house. Several persons exited and came towards the house holding bottles and bats. From previous confrontations, Romero recognized them as members of the "Eastside Gang." He took a few minutes to retrieve a rifle from under the floorboards of the house and then apparently fired at the car from inside the house. A shot struck and killed Joe Cervantes who was sitting in the front passenger seat.

Romero fled the San Luis Valley and was arrested in Adams County. Officers Rick Needham (Needham) and Shawn Woods of the Alamosa Police Department interrogated Romero at the Adams County jail on April 1, 1997, after Needham read Romero his *Miranda* rights and Romero had executed a written waiver. The record contains a tape recording of the interrogation, a fifty-four page transcript of the interrogation, and a suppression hearing transcript.

The first page of the interrogation transcript contains Needham's advisement to Romero.[1] Romero answered in response that he understood his rights and then signed the waiver form. Needham commenced the interrogation with open-ended questions about the circumstances of the shooting. Needham promptly turned to specific questions regarding Romero's intent and potential defenses:

> Needham: So what were you thinking when that gun went off?
>
> Romero: I don't know, I, I, I just don't know man, I was just [expletive], I was in fear man, for my life because they're, my kids were there, Vida's pregnant from me, ya know, I mean....
>
> Needham: *So you thought you were defending yourself when you shot at the car?*

> Romero: *Yea.* Cause I, ya know, I'm not gunna lie man, ya know, I mean I should wait, and *I should talk to a lawyer* and this and that and ya know *because I do want to go to trial on this.*

(Emphasis added.) Needham quickly continued to probe Romero's claim of self-defense:

> Needham: Did you think you'd have a valid point?

Romero proceeded thereafter to make potentially damaging statements about his prior contacts with the "gang members" and events surrounding the shooting, all the while attempting to justify himself to the interrogating officer. For example, he proceeded to state that he, Ortega, and a third person several nights before had gone to the house of the other persons—to say they wanted no trouble, he claimed—but left when they "started all panicking." He also said that he and Ortega discussed shooting the gang members during the three to four minutes it took to retrieve the rifle.

On page thirty-five of the transcript, when Romero again referenced legal counsel, Needham prolonged the questioning by indicating that Romero had already "made the choice" not to have a lawyer during questioning and holding out the possibility of a charge of less than first degree murder for Romero if he would continue talking without the assistance of counsel:

> Romero: I still won't be, I mean, I mean, look I already [expletive], see I don't even understand this man, cause....
>
> Needham: Okay, what don't you understand?
>
> Romero: People telling me that I shouldn't [expletive] talk to you guys.
>
> Needham: *Well I think by talking to us....*
>
> Romero: *That I should talk to a lawyer first....*
>
> Needham: *Well, you made the choice.*

---

1. The advisement given in this case is set forth on page 1:

> Time is 1354, we're at Adams County Jail with Mario Romero. Um, first, you do have a right to remain silent anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. *You can decide at any time to exercise each [sic] rights and not answer any questions or make any statements.* Do you understand everything I read to you? (Emphasis added.)

Romero: *I mean that I don't, ya know....*

Needham: Right now, when we walked in here, we were looking at 1st degree murder, okay, now I'm not so sure I'm looking at 1st degree murder. *I was looking at charging just you with 1st degree murder, but now I'm thinking Jesse's got a lot more involvement than Jesse's been telling me. Okay. I'm thinking maybe second or something else.* Okay. But that's the DA. (Emphasis added.) The interrogation lasted about two hours, including the time it took Romero to make a written statement during a break in the questioning. Three days later, on April 4, 1997, the prosecution charged Romero with murder in the first degree and other offenses[2] and sought to use his oral and written statements without restriction at trial.

At the suppression hearing, in reference to Romero's first statement, "I should talk to a lawyer," on the third page of the transcript, Needham testified that, "I did not at that point or any subsequent point or any prior point believe that he wanted a lawyer. I believe he wanted to talk to me."

The district court used a totality of the circumstances analysis in finding and concluding that,

> Mr. Romero's statement was an unambiguous request for an attorney. It was made shortly after the questioning began with his rights firmly in mind. He had declared his actions were in self-defense. Initially the detective asked open-ended questions that let the defendant talk. The detective then asked two specific questions seeking to obtain evidence of *mens rea.* It is at this point that the defendant states, "I should get an attorney."

Accordingly, the district court suppressed all oral and written statements which Romero made after requesting an attorney but determined that those statements could be used on cross-examination in the event that Romero testifies at trial.

The prosecution contends, under *Davis,* that Romero's statement was not a sufficiently clear expression of his desire for legal counsel. We disagree and uphold the district court's suppression order.

## II.

Under the Fifth Amendment to the United States Constitution,[3] we uphold the district court's findings and conclusions that Romero sufficiently clearly invoked his right to an attorney during questioning and that custodial statements he made subsequently during the interrogation must be suppressed.

### A.

#### *Self–Incrimination and the Right to Counsel During Custodial Interrogation*

 The Fifth Amendment privilege against self-incrimination includes the right to have a lawyer present during custodial interrogation. *Miranda v. Arizona,* 384 U.S. 436, 470, 86 S.Ct. 1602, 1626, 16 L.Ed.2d 694 (1966). An essential element of *Miranda* is that a suspect who commences answering questions without an attorney present may change his or her mind at any time thereafter in light of the questions being asked. If an accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612. The court held that a suspect has a right to counsel during custodial interrogation in order to dispel the "compelling atmosphere" of the interrogation. *Id.* at 465, 86 S.Ct. at 1623. The denial of a suspect's request for an attorney undermines his or her ability to exercise the privilege against self-incrimination, "to remain silent if he [chooses] or to

---

**2.** Romero was charged with: murder in the first degree, *see* § 18–3–102(1)(a), 6 C.R.S. (1997); criminal attempt to commit murder in the first degree, *see* § 18–2–101, 6 C.R.S. (1997); accessory to crime, *see* § 18–8–105(1)–(2), 6 C.R.S. (1997); murder in the first degree, *see* § 18–3–102(1)(d), 6 C.R.S. (1997); mandatory sentence for violent crimes, *see* § 16–11–309, 6 C.R.S. (1997).

**3.** In pertinent part, the Fifth Amendment to the United States Constitution states, "nor shall [a person] be compelled, in any criminal case, to be a witness against himself."

speak without any intimidation, blatant or subtle." *Id.* at 466, 86 S.Ct. at 1623. Moreover, without the protections flowing from an adequate warning and the rights of counsel, "'all the careful safeguards erected around the giving of testimony, whether by an accused or any other witness, would become empty formalities in a procedure where the most compelling possible evidence of guilt, a confession, would have already been obtained at the unsupervised pleasure of the police.'" *Id.* (quoting *Mapp v. Ohio*, 367 U.S. 643, 685, 81 S.Ct. 1684, 1707–08, 6 L.Ed.2d 1081 (1961)(Harlan, J., dissenting)).

▮ Whether an accused has invoked the right to counsel during questioning is an objective inquiry. In a 1994 decision, the United States Supreme Court held that the question requires the trial court to consider whether the accused's statement "'can reasonably be construed to be an *expression of a desire* for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991)) (emphasis added). If the desire for counsel is presented "*sufficiently clearly* that a reasonable police officer *in the circumstances* would understand the statement to be a request for an attorney," no ambiguity or equivocation exists, and all questioning must cease until the person can consult counsel or the accused voluntarily reinitiates conversation. *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355 (emphasis added).[4]

Our prior decisions addressing what is a sufficiently clear statement requesting counsel, as opposed to an ambiguous statement, are consistent with the *Davis* test and prior United States Supreme Court precedent. An ambiguous communication is a "type of conduct, giving rise to opposing inferences." *People v. Benjamin*, 732 P.2d 1167, 1171

(Colo.1987) (defendant's signing of a form to request a determination whether he was eligible for the assistance of counsel without cost to him was not a request for counsel under the Fifth Amendment; although his conduct supported an inference that he wanted an attorney, it also gave rise to an "equally logical inference" that he was considering his options and was not requesting counsel).

*Davis* requires a person to make a recognizable "expression of a desire" for legal assistance. *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355. We have said that a statement sufficiently reflects a desire for counsel when it "put[s] the officers on notice that the defendant intend[s] to exercise his right to counsel and his right against self-incrimination." *People v. Fish*, 660 P.2d 505, 509 (Colo.1983) (defendant's question to interrogating officer whether he needed an attorney to which officer answered no sufficiently clearly invoked right to counsel).

▮ Although the inquiry into whether an accused requested counsel is objective, it may take into account the fact that suspects may not, due to their particular characteristics and the circumstances of the police interview, request an attorney "in the most sophisticated or legally proper form." *People v. Harris*, 191 Colo. 234, 237, 552 P.2d 10, 12 (1976) (in connection with his rights being read, the suspect asked, "When can I get a lawyer," to which the interrogating officer replied, "Monday morning."). For example, a person's youth, lack of sophistication, and nervous and upset condition may be considered among other pertinent circumstances in determining whether his or her statement reasonably could be construed as a request for counsel. *See id.* at 236–37, 552 P.2d at 11–12. Because suspects may not be legally sophisticated or paragons of clarity in their use of language, "[w]hen reviewing a defen-

4. In *Davis*, about an hour and a half into the interview, the suspect said, "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 455, 114 S.Ct. at 2353. The police proceeded to explain his rights again, at which time the suspect said, "No, I'm not asking for a lawyer," and, "No, I don't want a lawyer." *Id.* After a short break, the interrogators reminded the suspect of his rights to remain silent and to counsel. The interview continued for another hour, and the suspect then said, "I think I want a lawyer before I say anything else." *Id.* At that time, questioning ceased. The Supreme Court allowed prosecutorial use of the statements made between the two accompanying statements, "Maybe I should talk to a lawyer," and, "No, I don't want a lawyer," and the later statement of the suspect that terminated the interrogation, "I think I want a lawyer."

dant's statement for an alleged ambiguity, courts must give 'a broad, rather · than a narrow, interpretation to a defendant's request for counsel.'" *People v. Kleber,* 859 P.2d 1361, 1363 (Colo.1993) (quoting *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986) (explaining that "the Sixth Amendment right to counsel at a postarraignment interrogation requires at least as much protection as the Fifth Amendment right to counsel at any custodial interrogation," *id.* at 632, 106 S.Ct. at 1408–09)).

In *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), the Court held that once the interrogation has begun after a *Miranda* advisement, and the suspect then invokes the right to counsel, a valid waiver of Fifth Amendment rights cannot be established by showing only that the accused continued to respond to further police-initiated questions. *Davis* did not overrule either *Miranda* or *Edwards;* rather, the Court declined to "extend" *Edwards* to "require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney." *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355. The Court encouraged but did not require clarification of a suspect's ambiguous reference. *See id.* at 461, 114 S.Ct. at 2356.

Here, the trial court engaged in a totality of the circumstances analysis under *Davis* in ruling that Romero sufficiently expressed his desire for the assistance of legal counsel. In light of the record, we defer to the trial court's findings and agree with the court's conclusions.

### B.

#### *The Trial Court's Totality of the Circumstances Analysis*

▮ The trial court properly engaged in a totality of the circumstances analysis. *Cf. People v. Trujillo,* 938 P.2d 117, 123 (1997) (issue of custodial interrogation is for trial court to determine based on totality of the circumstances); *see also People v. D.F.,* 933 P.2d 9, 14 (Colo.1997) ("We, like the trial court, review the totality of the circum-

stances in reaching the ultimate legal conclusion in suppression order cases.").

▮ The question before us is a mixed issue of law and fact. *See People v. Quezada,* 731 P.2d 730, 732 (Colo.1987) ("In reaching a decision on a motion to suppress a custodial statement, a court must engage both in factfinding—a specific inquiry into the historical phenomena of the case—and law application, which involves the application of the controlling legal standard to the facts established by the evidence."). The trial court must assess the reliability of evidence and credibility of witnesses while making an independent assessment of whether the suspect "sufficiently clearly" invoked the right to counsel based on the totality of the circumstances. When sufficient evidence exists in the record to support the trial court's findings of fact, we defer to those findings. *See People v. MacCallum,* 925 P.2d 758 (Colo.1996); *Quezada,* 731 P.2d at 732–33; *People v. Fish,* 660 P.2d 505, 509 (Colo.1983). The trial court's legal conclusion is subject to our de novo review. *See Quezada,* 731 P.2d at 732–33 (ultimate conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings is subject to correction by reviewing court).

▮ Following an evidentiary hearing, including review of the tape recording and transcript of the custodial interrogation, the trial court entered oral and written rulings that Romero's statement, "I should talk to a lawyer ... because I do want to go to trial on this," was a sufficient request for legal counsel under the totality of the circumstances. The record on review demonstrates that the trial court properly considered the following factors in determining that Needham had sufficient reason to believe that Romero had invoked his right to counsel: (1) the words spoken by the interrogating officer; (2) the words used by the suspect in referring to counsel; (3) the officer's response to the suspect's reference to counsel; (4) the speech patterns of the suspect; (5) the content of the interrogation; (6) the demeanor and tone of the interrogating officer; (7) the suspect's behavior during interrogation; (8) the point at which the suspect invoked counsel; and (9) who was present dur-

ing the interrogation. *Cf. People v. Trujillo,* 938 P.2d 117, 124 (Colo.1997) (employing similar factors in determining the issue of custodial interrogation).

The trial court found that Romero affirmatively stated his desire to talk to a lawyer in light of the questions being asked about his self-defense rationale. He invoked his right to counsel within minutes after being delivered the *Miranda* advisement. He did not make accompanying ambiguous or contradictory statements. His statement occurred in immediate response to questions directed by the custodial interrogator at ascertaining his involvement in the shooting and his mental state with regard to the crime.

Made at a critical and early point in the interrogation, Romero's remark demonstrated his intent to defend himself through counsel in light of the questions being asked. Though courteous and businesslike in tone, Needham ignored Romero's desire for counsel and instead proceeded quickly with an examination designed to elicit details which might overcome Romero's self-defense claim. Under these circumstances, the trial court did not believe that the officer conducting the questioning "reasonably [did] not know whether or not the suspect want[ed] a lawyer." *Davis,* 512 U.S. at 460, 114 S.Ct. at 2355.

▮▮▮▮ Upon reviewing the record, we agree with the trial court's conclusions. Police officers and judicial officers serve a diverse community. The trial court must determine what weight to give to the officer's testimony at the suppression hearing and need not defer to the officer's view of what occurred in the interrogation. As we recognized in *People v. Harris,* 191 Colo. 234, 236–37, 552 P.2d 10, 12 (1976), citizens under custodial interrogation will speak in their own tongues under circumstances that are inherently stressful:

> The defendant made a request for an attorney, and the police officers were thereby placed on notice that the defendant intended to exercise his constitutional rights. Admittedly, the demand was not in the most sophisticated or legally proper form, but it was adequate. At that point, all interrogation should have ceased until

an attorney was made available to the accused. The fact that the accused did not "demand" an attorney does not persuade us that he was not exercising his rights. The accused was young, timid, and inexperienced in such situations; his failure to make a forceful demand for counsel does not dilute the fact that he made a request.

The interrogating officer testified at the suppression hearing that he did not understand Romero to be requesting counsel because he did not plainly use the words, "I think I should talk to a lawyer," or "I want a lawyer," or "something along those lines." But, the import and effect of a suspect's phraseology in requesting counsel does not depend on the officer's subjective preference for word choice. The legal standard is objective— whether in the context of question and answer, the suspect's responses reasonably could be construed by a police officer to mean that the suspect wanted a lawyer.

The court in *Davis* observed that a suspect need not " 'speak with the discrimination of an Oxford don' " but must "articulate his desire to have counsel present sufficiently clearly." *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355 (quoting *id.* at 476, 114 S.Ct. at 2364 (Souter, J., concurring)). The trial court in applying *Davis* properly took into account Romero's pattern of speech. Romero punctuated his responses with expletives and slang, such as "ya know," "uh," "dude," "this and that," "I was like," and "I don't know." He started sentences with "so," "well," or " 'cause," leaving off either the subject or both the subject and verb and splicing sentences with "ya know." Romero repeatedly said, "I'm not gunna lie man," and, "I'm straight up man," in trying to justify himself to the police. For example, at one point, he stated: "I didn't [expletive] do this out of ya know anger or nothing like that, ya know, I mean I'm straight up man, I think I did this out of self-defense, whether anyone believes that or not."

Romero's full statement invoking counsel for the first time was: "Yea. Cause I, ya know, I'm not gunna lie man, ya know, I mean I should wait, and I should talk to a lawyer and this and that and ya know because I do want to go to trial on this."

■ We will not substitute our judgment for that of the trial court on factual issues relating to the suppression of the defendant's statements. *See Harris*, 191 Colo. at 236, 552 P.2d at 12. The trial court analyzed Romero's statement in its contextual circumstances and considered Needham's testimony at the evidentiary hearing that Romero was in effect saying, "I know I should talk to a lawyer, but I'm going to tell you what happened." The trial court did not accept Needham's explanation. Rather, the court determined that Needham elected to proceed with an effort to have Romero incriminate himself, despite a sufficiently clear request for counsel, through Needham's rapid progression from Romero's "I should talk to a lawyer" to Needham's "Did you think you'd have a valid point?" The trial court observed that "[t]he fact that the defendant wanted to tell his story does not negate the fact that he requested an attorney."

The word "should" means "to express duty, obligation, necessity, propriety, or expediency," *Webster's Third New International Dictionary* 2104 (1961) (meaning 2), and also "to express a desire or request in a polite or unemphatic manner," *id.* (meaning 6). An archaic definition of "should" is "might" or "could." *Id.* (meaning 4). The trial court concluded that Romero's statement, "I should talk to a lawyer," reasonably conveyed that the interrogating officer should provide him with an attorney in light of the questioning. Referring to prior cases in which the suspect had sufficiently invoked the right to counsel, the trial court found that, "it is obvious that the language chosen by Mr. Romero was far clearer than in some of these cases and impossible to distinguish from others."

We previously have held that a suspect unambiguously requested counsel when she said, "I think I better have a lawyer." *People v. Cerezo*, 635 P.2d 197, 199 (Colo.1981). In *People v. Traubert*, 199 Colo. 322, 328, 608 P.2d 342, 346 (1980), the defendant's statement, "I think I need to see an attorney," was a sufficiently clear assertion of the right

to counsel. In *People v. Harris*, 191 Colo. 234, 235–37, 552 P.2d 10, 11–12 (1976), the defendant asked interrogating detectives, "When can I get a lawyer?" This, too, was adequate. In light of *Davis*, we reaffirm such invocations of the right to counsel as being sufficiently clear for Fifth Amendment purposes.

■ The right to the assistance of one's own attorney during questioning is a primary corollary to the constitutional privilege not to incriminate oneself. This constitutional right is not restricted to citizens who are sophisticated in the use of attorneys and accustomed to their availability. *See Miranda*, 384 U.S. at 472, 86 S.Ct. at 1626–27. When invoking the right to counsel during custodial interrogation, a person may *demand* an attorney, a person may *ask for* an attorney, or a person may make some statement which can "reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355. When any of these occurs, the police need not provide "instant counsel" but must cease the questioning and provide a reasonable opportunity for the person to consult counsel. *See Harris*, 191 Colo. at 237, 552 P.2d at 12–13.

Upon review of the record, we determine that the evidence supports the trial court's findings, and we hold that Romero reasonably conveyed his desire for the assistance of counsel in light of the interrogating officer's questions.

### III.

Accordingly, we affirm the district court's order suppressing oral and written statements and return the case for further proceedings consistent with this opinion.

MULLARKEY, J., dissents.

Justice MULLARKEY dissenting.

The defendant in this case, Mario Romero (Romero), is charged with first degree murder and related crimes[1] resulting from the

---

1. The crimes charged are: murder in the first degree, *see* § 18–3–102(1)(a), 6 C.R.S. (1997); criminal attempt to commit murder in the first

degree, *see* § 18–2–101, 6 C.R.S. (1997); accessory to crime, *see* § 18–8–105(1)–(2), 6 C.R.S. (1997); murder in the first degree, *see* § 18–3–

shooting death of Joe Cervantes. The issue before us is whether the trial court properly suppressed statements made by Romero during the course of a custodial interrogation conducted after Romero had been advised of his *Miranda*[2] rights and after he had voluntarily waived those rights. The trial court found that Romero asserted his right to counsel after the interrogation began. On that basis, the court suppressed Romero's subsequent statements and the majority upholds the suppression order. I respectfully dissent. Under *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), these statements should not be suppressed.

## I.

As an initial matter, I disagree with the deferential standard of review adopted by the majority. *See* maj. op. at 555. While we defer to a trial court's findings of disputed fact, the application of a legal standard to historical fact is a matter for *de novo* appellate review. *See People v. Gennings,* 808 P.2d 839, 844 (Colo.1991); *People v. Quezada,* 731 P.2d 730, 732–33 (Colo.1987); *see also United States v. Fike,* 82 F.3d 1315, 1324 (5th Cir.1996) (stating that whether *Miranda* guarantees have been violated is a matter of constitutional law, meriting *de novo* review). As we stated in *Quezada:*

> A court's findings of historical fact are entitled to deference by a reviewing court.... An ultimate conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings, however, is subject to correction by a reviewing court, as is a court's application of an erroneous legal standard to the facts of the case.

*Quezada,* 731 P.2d at 732–33.

Although the majority twice states that it defers to the trial court's findings, *see* maj. op. at 555, 556, the court actually made no findings on disputed issues of fact. We sit in the same position as the trial court did when it evaluated the transcript and audiotape of the interrogation. The *Davis* decision did

not rest on a deferential standard of review. Rather, the Court reached its own conclusion that the defendant's statement, "Maybe I should talk to a lawyer," was not a request for counsel. *See Davis* at 462, 114 S.Ct. at 2357. Thus, the question of whether Romero's reference to counsel was sufficient under *Davis* to invoke his right to counsel is a conclusion of law to which I would apply a *de novo* standard of review.

## II.

Under the Fifth Amendment to the United States Constitution, the privilege against self-incrimination includes the right to have a lawyer present during custodial interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694 (1966); U.S. Const. amends. V, XIV. In *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981), the Supreme Court, drawing a "bright line" prophylactic rule, held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation.

In *Davis,* 512 U.S. at 459–60, 114 S.Ct. at 2355–56, however, the Supreme Court refused to extend *Edwards* to require law enforcement officers to cease questioning immediately upon the defendant's ambiguous or equivocal reference to an attorney. The Supreme Court held that if the suspect's statement is not an unambiguous or unequivocal request for counsel, law enforcement officers are not required to stop questioning or even to clarify whether the suspect is requesting counsel. *See id.* at 461–62, 114 S.Ct. at 2356–57.

Prior to *Davis,* our Colorado case law established that when a suspect made an ambiguous reference to counsel that reasonably could be considered a request for counsel, the interrogating officer had a duty to cease questioning, except for limited questioning that would clarify the suspect's intent concerning the presence of counsel. *See People v. Kleber,* 859 P.2d 1361, 1364–65 (Colo.1993).

---

102(1)(d); mandatory sentence for violent crimes, *see* § 16–11–309, 6 C.R.S. (1997).

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

However, *Davis* explicitly rejected the clarification requirement and thus, overruled, in part, *Kleber* and related cases. As a consequence, the Fifth Amendment does not require an interrogating officer to clarify or to stop questioning when a suspect makes an ambiguous or equivocal reference to counsel. *See Davis,* 512 U.S. at 461–62, 114 S.Ct. at 2356–57. "Rather, the suspect must *unambiguously* request counsel," *id.* at 459, 114 S.Ct. at 2355 (emphasis added), in order for questioning to cease.

Stated in other words, after *Davis,* interrogation must cease only if the suspect makes "a clear assertion of the right to counsel." *See Davis,* 512 U.S. at 460, 114 S.Ct. at 2356. Thus, the Supreme Court placed the burden on the suspect to make known his or her change of mind after initially waiving the right to counsel. It explained that the fact that a suspect may be unable to make a clear assertion because of fear, poor language skills, or any other reason is immaterial because the suspect has had the primary protection of the *Miranda* warnings themselves and has freely chosen to speak to the police officers. *See id.* at 460–61, 114 S.Ct. at 2356.

The concurring justices in *Davis* criticized the majority for unfairly placing a "demand of heightened linguistic care" on the suspect. *See Davis,* 512 U.S. at 469, 114 S.Ct. at 2360 (Souter, J., concurring in judgment). The concurrence rejected the majority's "theory that so long as the burden to demonstrate waiver rests on the government, it is only fair to make the suspect shoulder a burden of showing clear subsequent assertion." *See id.* at 471, 114 S.Ct. at 2361. Unlike the concurrence, we cannot reject the *Davis* majority. In my view, *Davis* is a significant change in the applicable legal standard.

The test now is whether the suspect made a clear, unambiguous request for counsel, *i.e.,* whether a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *See Davis,* 512 U.S. at 459, 114 S.Ct. at 2355. A totality of the circumstances analysis is applicable to suppression order cases and "we, like the trial court, review the totality of the circumstances in reaching the ultimate legal conclusion in suppression order cases." *People v. D.F.,* 933 P.2d 9, 13 (Colo.1997); *see* maj. op. at 555. These circumstances include the tone of the interrogator and the atmosphere surrounding the interrogation. *Cf. D.F.,* 933 P.2d at 14 (reviewing the videotape of the interrogation and considering the officer's demeanor and conduct in determining whether police officer's conduct was coercive); *People v. Dracon,* 884 P.2d 712, 719 (Colo.1994) (reviewing the totality of the circumstances including the videotaped interrogation and noting that the detective displayed a stern demeanor and serious tone and was confrontational).

### III.

In applying the relevant legal test to the facts of this case, I reach a different result from that of the majority. It is uncontroverted that the initial *Miranda* advisement in this case was sufficient and that Romero's initial waiver of his *Miranda* rights was valid. The trial court held that Romero's statements were voluntary and not the product of coercion or promises. In fact, the majority acknowledges that the tone of Needham was courteous. *See* maj. op. at 556. The relevant part of the interrogation is as follows:

Needham: So what were you thinking when that gun went off?

Romero: I don't know, I, I, I just don't know man, I was just [expletive deleted], I was in fear man, for my life because they're, my kids were there, Vida's pregnant from me, ya know, I mean ...[3]

Needham: So you thought you were defending yourself when you shot at the car?

Romero: Yea. Cause I, ya know, I'm not gunna lie man, ya know, I mean I should wait, and I should talk to a lawyer and this and that and ya know because I do want to go to trial on this.

---

3. At this point in the audiotape, Romero stops speaking and there is a brief pause before Needham continues. The ellipsis is in the original transcript apparently to indicate the pause.

Needham: Did you think you'd have a valid point?[4]

The majority construes Romero's reference to a lawyer to be an assertion of his right to counsel. It states, "Needham ignored Romero's desire for counsel and instead proceeded quickly with an examination designed to elicit details which might overcome Romero's self-defense claim." Maj. op. at 556.

In my opinion, the statement does not meet the *Davis* standard of a clear, unequivocal assertion by Romero of his right to counsel. In applying the totality of the circumstances analysis, I do not agree with the majority's characterization of Needham as ignoring Romero's desire for counsel and quickly proceeding with an examination. *See* maj. op. at 556. Of course, the majority's characterization of the conversation is subjective, but the audiotape discloses nothing hurried about Needham's questioning. Contrary to the majority's implication, Romero had ample opportunity to make any statement he chose. As I note in footnote 4, there is a pause in this critical portion of the interrogation while Needham waits for Romero to finish his sentence and only begins speaking after Romero's voice trails off into silence. This exchange is typical of the tone of the interrogation. Needham is courteous and low key throughout.

What the majority omits from its totality of the circumstances analysis is any assessment of how a reasonable police officer would have interpreted Romero's remark. Officer Needham testified, "In the totality of everything that has gone on in this particular interview at this particular time, it was not my impression that he wanted to see a lawyer to consult with at the time of the interview." The question is whether Needham's understanding was reasonable. I would conclude that it was a reasonable interpretation. Romero's statement is subject to at least two interpretations. One is Needham's understanding that Romero was acknowledging that he knew he should talk with a lawyer but that he had decided to go ahead and speak with Needham. He hoped to convince the officer that he acted in self-defense. The other interpretation is that endorsed by the majority, an interpretation made by excerpting and emphasizing certain words which do not stand out in the audiotape. *See* maj. op. at 552, 557. Romero's statement does not meet the "unambiguous or unequivocal" test we are required to apply under *Davis*. *See Davis*, 512 U.S. at 461–62, 114 S.Ct. at 2356–57. Rather, it is the quintessential equivocal statement.[5] In my view, it is entirely unrealistic to ask a police officer to distinguish between the statement in *Davis*—"Maybe I should talk to a lawyer"—which the Supreme Court held *was not* a request for counsel and the statement in this case—"I should talk to a lawyer"—which the majority holds *was* a request for counsel.

Accordingly, I respectfully dissent.

---

4. Romero responds, "I think I do" and continues speaking.

5. "Equivocal" means "having two or more significations: capable of more than one interpretation." *Webster's Third New International Dictionary* 769 (1986).