**Dan CORSENTINO, Sheriff of the County of Pueblo, in his official capacity, Petitioner,**

**v.**

**Alonso G. CORDOVA, Mark Allen Cordova, Theresa Marie Randall and Thomas Anthony Cordova, Respondents.**

**No. 99SC111.**

Supreme Court of Colorado,
En Banc.

June 26, 2000.

Rehearing Denied July 31, 2000.

Vaughan & DeMuro, Gordon L. Vaughan, Shelby Felton–Schnack, Colorado Springs, Colorado, Attorneys for Petitioner.

Cross, Bennett & Hessel, LLC, Joseph F. Bennett, Keith F. Cros, Colorado Springs, Colorado, Attorneys for Respondents.

Office of the City Attorney, City of Aurora, Charles H. Richardson, Robert M. Rogers, Julia A. Bannon, Aurora, Colorado, Attorneys for Amicus Curiae City of Aurora.

Sears & Swanson, P.C., Victoria C. Swanson, Colorado Springs, Colorado, Attorneys for Amicus Curiae for the Colorado Trial Lawyers Association.

Justice MARTINEZ delivered the Opinion of the Court.

Petitioner, Pueblo County Sheriff Dan Corsentino, challenges the court of appeals' decision, *Cordova v. Pueblo West Metropolitan District*, 986 P.2d 976 (Colo.App.1998), upholding the trial court's denial of his motion to dismiss a wrongful death action filed against him based on the actions of his employee, Deputy Sheriff Fred Cortese. In his motion to dismiss, Corsentino argued that the governmental immunity granted by the Colorado Governmental Immunity Act (GIA) to emergency vehicle operators barred the suit filed against him. The first of two issues raised by Corsentino asks us to decide the legal standard under the GIA for determining when an emergency vehicle operator faces an exigency that calls for immediate action. We are also called upon to determine whether an emergency vehicle operator exceeding the legal speed limit must comply with the condition of section 42–4–108(2)(c), 11 C.R.S. (1999), which allows an emergency

vehicle operator to speed "so long as said [operator] does not endanger life or property," in order to fall within the provisions of the GIA that grant immunity to emergency vehicle operators.[1]

## I.

On the afternoon of July 30, 1995, Cortese received a dispatch to a home burglary alarm. Cortese responded to the dispatch as an emergency call, using the sirens and lights of his sheriff cruiser. In route to the home burglary alarm, Cortese was driving south at a speed of 50 to 60 m.p.h. in a 35 m.p.h. speed zone.

While driving at this speed, Cortese approached an intersection at the same time that Erlinda Cordova was making a left turn in her car, crossing Cortese's path. The two cars collided. Before impact, Cortese still had his lights and sirens engaged, but did not slow down. As a result of the collision, Cordova received severe injuries that resulted in her death.

Under the doctrine of respondeat superior, Cordova's surviving husband and children (the Plaintiffs) filed a wrongful death action against Corsentino in his official capacity.[2] The Plaintiffs alleged that Cortese's negligent actions caused Cordova's death while he was employed as Corsentino's deputy. Corsentino filed a C.R.C.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction on the basis that Cortese had immunity as the operator of an emergency vehicle under the GIA.

After holding a hearing on the motion, the trial court denied Corsentino's motion to dismiss, ruling that Cortese did not qualify for immunity as the operator of an emergency vehicle under the GIA because he was not responding to an emergency call. The trial court found that home burglary alarms are too unreliable to constitute an emergency call.

As a separate basis for its ruling, the trial court held that Cortese did not qualify for the exception of section 24–10–106(1)(a), 7 C.R.S. (1999), through which the GIA grants immunity to emergency vehicle operators. In reaching its holding, the trial court applied the condition of section 42–4–108(2)(c), which allows an emergency vehicle operator to exceed the lawful speed limits "so long as said [operator] does not endanger life or property," to limit the emergency vehicle exception of section 24–10–106(1)(a). Because the trial court found that Cortese's "operation of his vehicle endangered life and property," it concluded that he did not qualify for the exception of section 24–10–106(1)(a).

Corsentino appealed the trial court's ruling denying his motion to dismiss. On appeal, Corsentino argued that the trial court used an improper standard for determining that Cortese was not responding to an emergency and that the trial court improperly applied the condition of section 42–4–108(2)(c) to limit the emergency vehicle exception of section 24–10–106(1)(a). The court of appeals did not address the issue of whether Cortese was responding to an emergency call. Instead, accepting the trial court's interpretation of the pertinent provisions, the court of appeals upheld the trial court's ruling because the record supported the trial court's finding that Cortese endangered life and property when he exceeded the speed limit. *See Cordova,* 986 P.2d at 979.

---

1. We granted certiorari on the following issues:

    (1) Whether the court of appeals' opinion impermissibly permits a trial court to impose its own post hoc judgment on good faith discretionary determinations by police officers and other public employee drivers of emergency vehicles that they are responding to an "emergency call" to service.

    (2) Whether the court of appeals' opinion impermissibly applies the "endanger life or property" provisions of the Colorado traffic code to limit tort immunity afforded police officers and other public employee drivers of emergency vehicles.

2. The Plaintiffs also filed a tort action against the Pueblo West Metropolitan District (PWMD). They argued that the PWMD created a dangerous condition of a road or street by negligently maintaining a median strip with trees and bushes that obstructed the vision of the deceased at the time of the accident. The trial court denied the PWMD's motion to dismiss for lack of subject matter jurisdiction, and the court of appeals reversed, holding that the GIA barred the tort action filed against the PWMD. *See Cordova v. Pueblo West Metro. Dist.,* 986 P.2d 976, 978–79 (Colo.App.1998). We do not address the dismissal of this claim because the Plaintiffs did not appeal this part of the court of appeals' decision.

## II.

Our analysis begins with an outline of the pertinent statutory provisions, the issues presented, and the standard of review. We then address the proper standard for determining what constitutes an "emergency call" under the GIA. We complete our analysis by determining whether the "endanger life or property" condition of the traffic code applies to the immunity provisions of the GIA.

### A.

In response to our decision abrogating the governmental immunity of Colorado's common law, the General Assembly enacted the GIA in 1971. *See Evans v. Board of County Comm'rs*, 174 Colo. 97, 482 P.2d 968 (1971) (abrogating common law governmental immunity); ch. 323, sec. 1, §§ 130–11–1 to –17, 1971 Colo. Sess. Laws 1204, 1204–11 (enacting the GIA). The GIA generally establishes governmental immunity from suit in tort actions filed against public entities or their employees. *See* § 24–10–106. The GIA then withdraws and restores this immunity through a series of immunity waivers, exceptions to those waivers, and, in some cases, conditions relating to the exceptions.

Because the GIA's immunity derogates Colorado's common law, legislative grants of immunity must be strictly construed. *See Bertrand v. Board of County Comm'rs*, 872 P.2d 223, 227 (Colo.1994). As a logical corollary, we construe the GIA provisions that withhold immunity broadly. *See Walton v. State*, 968 P.2d 636, 643 (Colo. 1998); *City & County of Denver v. Gallegos*, 916 P.2d 509, 515 (Colo.1996) (Scott, J., dissenting) (quoting *Bertrand*, 872 P.2d at 229). As such, when deciding how to construe the waiver and exception provisions of the GIA, we look to the ultimate effect that each has on immunity.

Thus, although we construe the immunity waiver provisions broadly, *see Walton*, 968 P.2d at 643, we construe the exceptions to these waivers strictly because the ultimate effect of the exceptions is to grant immunity. We recognize that the approach we are taking to interpreting the waivers and exceptions of immunity, while consistent with our decision in *Walton*, conflicts with the approach we took in *Gallegos*.[3] Without disturbing the interpretation of the term "public facility" that we proffered in *Gallegos*, we disapprove of the case's language that immunity waivers are to be construed narrowly. *See* 916 P.2d at 511; *see also Flores v. Colorado Dep't of Corrections*, 3 P.3d 464, 465 (Colo.App.1999) (noting the inconsistency between *Gallegos* and *Walton* in construing immunity waivers); *Lawrence v. Buena Vista Sanitation Dist.*, 989 P.2d 254, 255 (Colo. App.1999) (same).

With these principles of statutory construction in mind, we turn to the specific provisions that are pertinent to this case. Section 24–10–106(1) provides, "A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort ... except as provided otherwise in this section." As relevant to this case, the GIA waives a public entity's immunity from tort actions for injuries resulting from "[t]he operation of a motor vehicle, owned or leased by [a] public entity, by a public employee while in the course of employment." § 24–10–106(1)(a).[4]

Section 24–10–106(1)(a) then creates an exception to the immunity waiver for "emergency vehicles operating within the provisions of section 42–4–108(2) and (3), C.R.S."[5] That is, if an emergency vehicle operates within section 42–4–108(2) and (3), 11 C.R.S. (1999), the emergency vehicle operator qualifies for immunity by falling under the emer-

---

**3.** In *Gallegos*, we inaccurately used the term "exception" to refer to the immunity waiver at issue because the immunity waiver was in effect an "exception" to the GIA's general grant of immunity. *See* 916 P.2d at 511. Here, we are more careful with the term "exception" as the focus of the second issue in this case concerns an actual exception to an immunity waiver.

**4.** The GIA also waives immunity for injuries resulting from a public entity's operation of certain

public facilities, such as hospitals and gas facilities. The GIA further waives immunity for injuries resulting from dangerous conditions that exist in certain public areas, such as highways and public buildings. *See* § 24–10–106(1)(b)–(f).

**5.** For purposes of brevity and clarity, we will refer to the immunity waiver as the motor vehicle immunity waiver and the exception as the emergency vehicle exception.

gency vehicle exception to the motor vehicle immunity waiver.

Forming part of the Colorado Traffic Code, the referenced section 42–4–108 [6] specifically regulates the operation of emergency vehicles. In 1995, when the events of this case unfolded, the provisions provided:

> (2) The driver of an authorized emergency vehicle, *when responding to an emergency call,* ... may exercise the privileges set forth in this section, but *subject to the conditions stated in this article.* The driver of an authorized emergency vehicle may:
>
> (a) Park or stand, irrespective of the provisions of this title;
>
> (b) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;
>
> (c) Exceed the lawful speeds ... *so long as said driver does not endanger life or property;*
>
> (d) Disregard regulations governing directions of movement or turning in specified directions.
>
> (3) The exemptions granted in paragraphs (b) to (d) of subsection (2) of this section to an authorized emergency vehicle shall apply only when such vehicle is making use of audible and visual signals. . . .

§§ 42–4–108(2) & (3), 17 C.R.S. (1995 Supp.) (emphasis added).

In summary, section 24–10–106 grants immunity to public entities and their employees generally. The motor vehicle immunity waiver of section 24–10–106(1)(a) takes away this immunity for the operation of motor vehicles by public entities and their employees. The emergency vehicle exception, however, restores immunity to the public entities and their employees operating emergency vehicles in response to emergency calls. Subsections (a) to (d) of section 42–4–108(2) specifically grant immunity for specific traffic violations, such as speeding and running stop signals. Finally, there are possible conditions to the violations of subsections (b) and (c), which, if left unsatisfied, may place the public entities and their employees back within the motor vehicle immunity waiver, thereby subjecting them to potential liability in tort.

█ Examining these same provisions in *Fogg v. Macaluso,* 892 P.2d 271, 276 (Colo. 1995), we held that whether a public entity qualifies for immunity under the emergency vehicle exception is a question of subject matter jurisdiction. *See also Trinity Broadcasting of Denver, Inc. v. City of Westminster,* 848 P.2d 916, 924 (Colo.1993). As such, if raised before trial, the issue is properly addressed pursuant to a C.R.C.P. 12(b)(1) motion to dismiss, as the trial court did in this case. *See Fogg,* 892 P.2d at 276.

In *Fogg,* we also defined "emergency" under section 42–4–108(2) for purposes of qualifying for the emergency vehicle exception as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" or "a pressing need: EXIGENCY." *Id.* at 274 (quoting *Webster's Seventh New Collegiate Dictionary* 270 (1963)). However, we did not specify the proper legal standard for determining whether the operator of an emergency vehicle was responding to an emergency call.

The first issue raised before us calls on us to articulate this standard for determining when an emergency vehicle operator is responding to an emergency as defined in *Fogg.* The second issue we address is whether the "endanger life or property" condition of the traffic code applies to the emergency vehicle exception of the GIA.

█ Normally immunity determinations raised pursuant to a C.R.C.P. 12(b)(1) motion are reviewed under the clearly erroneous standard because they are essentially factual. *See Trinity Broadcasting,* 848 P.2d at 924–25. In this case, however, we review the trial court's ruling de novo because the two issues involve pure questions of law: the proper legal standard for making a factual determination and statutory interpretation. *See People v. Romero,* 953 P.2d 550, 555 (Colo.1998) (a court's application of a legal standard to the historical facts of a case is a question of law); *Robles v. People,* 811 P.2d

---

6. Before being relocated within the code in 1994, section 42–4–108(2) and (3) was previously section 42–4–106(2) and (3), 17 C.R.S. (1993).

804, 806 (Colo.1991) (statutory interpretation is a question of law and is reviewed de novo).

### B.

The first issue raised by Corsentino is whether the trial court used the correct legal standard when it determined that Cortese was not responding to an emergency.[7] Corsentino argues that the trial court relied on an improper standard when it found that Cortese was not responding to an emergency call under section 42–4–108(2). We agree.

Initially, we note that several different standards are possible for determining whether an emergency vehicle operator was responding to an emergency. For example, we could adopt a subjective standard under which the trial court's inquiry would be whether the emergency vehicle operator held a good faith, subjective belief that she was responding to an emergency situation. At the other extreme, we could allow courts to survey the entire situation, without imposing any restriction on the evidence they could consider, and use their own judgment to determine whether the incident in question ultimately constituted an emergency. Another possible standard could be drawn from the caller's perspective, examining whether the caller believed an emergency situation existed. We view these standards as inappropriate for determining whether an emergency exists for immunity purposes.

In our view, the proper standard for determining whether an emergency vehicle operator was responding to an emergency call under section 42–4–108(2) is an objective standard from the perspective of a reasonable emergency vehicle operator. Under this standard, courts must decide whether the emergency vehicle operator reasonably believed that she was responding to an emergency based on information she knew or should have known. That is, besides the information that a reasonable emergency vehicle operator should possess, this perspective also includes the actual information available to the emergency vehicle operator at the time she received the dispatch.

We favor this standard over other possible standards because it strikes a balance between the competing policies of the GIA. The GIA has a general policy of protecting the public by allowing the public to seek redress for personal injuries caused by a public entity in certain cases. *See Walton,* 968 P.2d at 643 (one of the GIA's purposes is "to allow the common law of negligence to operate against governmental entities"); *State v. Moldovan,* 842 P.2d 220, 222 (Colo.1992) (one purpose of the GIA is to allow "a person to seek redress of personal injuries caused by a public entity"). Competing with this policy, the main policy of granting immunity to emergency vehicle operators specifically is "to facilitate the public benefit gained from quick responses to [emergency] situations." *Fogg,* 892 P.2d at 275.

Given these competing interests, the standard for determining whether an emergency exists should not be so deferential as to prevent legitimate recovery. Conversely, it should give enough deference to emergency vehicle operators' decisions so that there is no chilling effect on their responses to emergencies. The standard we adopt today achieves these two goals.

Regarding the first policy goal, this objective standard from the perspective of a reasonable emergency vehicle operator is not so deferential as to bar recovery in almost every case. In contrast, a standard based on the subjective belief of an emergency vehicle operator would erode the emergency vehicle exception to the motor vehicle immunity waiver, thereby preventing any legitimate recovery from even the most incompetent emergency vehicle operators. An emergency vehicle operator simply would have to show a good faith, subjective belief that she was responding to an emergency to qualify for immunity, no matter how unreasonable her belief was. The standard we adopt today, however, allows recovery for personal injuries from those emergency vehicle operators who unreasonably respond to calls as emergencies.

---

**7.** Although Corsentino raised this issue before the court of appeals, the court chose not to address it in its opinion. We address it here, however, because it is a significant issue not previously addressed by this court, and Corsentino properly raised it before us.

Further, this standard avoids a chilling effect on the public's interest in quick responses to emergency situations. The objective standard from the perspective of a reasonable emergency vehicle operator gives deference to emergency vehicle operators' decisions as courts look only to what the emergency vehicle operator knew or should have known at the time of the response. In contrast, a standard imposing no restriction on the information considered by the courts would extinguish any deference to emergency vehicle operators' response decisions. The standard we adopt today, however, keeps courts from imposing their own judgment with the ²%₀ vision of hindsight on these split-second decisions made by emergency vehicle operators under rapidly changing circumstances. *See Dixon v. Richer*, 922 F.2d 1456, 1462 (10th Cir.1991).

Without expressly adopting this standard, we implicitly approved of it in *Fogg* by citing to other authorities discussing the proper standard of care in emergency situations. *See* 892 P.2d at 275 n. 2 (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 33, at 196–97 (5th ed.1984), which explains that, in an emergency situation, the standard of care is that of a reasonable person under the emergency circumstances). We referred to the standard as support for the definition we adopted for "emergency." *See id.*

We draw further support for this objective standard from a reasonable emergency vehicle operator's perspective from *Fiser v. City of Ann Arbor*, 417 Mich. 461, 339 N.W.2d 413, 417 (1983). The *Fiser* court held that this standard was proper for determining whether a law enforcement officer properly responded to a car chase as an emergency. *See id.* The court reached this holding after analyzing the Michigan statutory provisions regulating governmental immunity, which were almost identical to the Colorado provisions. *See id.* at 416–17 (interpreting M.C.L. § 257.2; M.S.A. § 9.2303).

This standard is also used for various determinations surrounding a wide range of police officers' conduct. *See generally Dixon*, 922 F.2d at 1462 ("perspective of a reasonable officer" determines the reasonableness of officer's use of force); *People v. Blehm*, 983 P.2d 779, 795 (Colo.1999) (same

standard deemed proper for determining whether officer appropriately relied on a flawed warrant).

■ We note that, under the standard we adopt today, whether the incident turns out to be an actual emergency has no bearing on a court's determination of whether the emergency vehicle operator was responding to an emergency. That is, when making its determination, a court should not consider information subsequently learned about the actual incident in question. At the time the emergency vehicle operator receives the dispatch, she may not know, and cannot be charged with knowing, whether the incident will develop into an actual emergency. Hence, by looking to information subsequently learned about the incident, a court would improperly impute information to the emergency vehicle operator of which she is not aware. Doing so is inconsistent with the standard we adopt today and erodes the deference granted to the emergency vehicle operator's response decision.

■ On the other hand, a proper consideration is the emergency department's policy, if any, in force at the time of the incident. If the department responding to the call in question has a policy governing the proper response action for certain circumstances, courts should give substantial weight to that policy. It is reasonable to assume that an emergency vehicle operator is or should be aware of her department's policy. If the emergency vehicle operator responds to the situation as directed by the policy, there is a strong likelihood that her response is reasonable under the circumstances. Conversely, if the emergency vehicle operator proceeds against the established policy given the circumstances of the situation, there is a strong likelihood that her response is not reasonable.

Here, the trial court's order illustrates that the trial court looked to the Plaintiffs' evidence without questioning whether Cortese was aware or should have been aware of the information contained in the evidence. Instead, in finding that Cortese was not responding to an emergency, the trial court used a standard that was based on a seemingly broader perspective than that of a rea-

sonable emergency vehicle operator. The trial court's perspective was that of an after-the-fact observer in possession of all the pertinent information surrounding the incident.

Hence, we reject the trial court's standard as being inconsistent with the objective standard viewed from the perspective of a reasonable emergency vehicle operator. Normally, we would reverse the trial court's ruling and remand with further instructions. In this case, however, the trial court articulated an independent basis that we agree supports its ruling that the GIA did not bar the action in this case.

### C.

Independent of the question of whether Cortese was responding to an emergency call, the trial court applied the "endanger life or property" condition of the traffic code to the emergency vehicle exception as an independent basis for its holding that immunity did not bar the suit in this case. The court of appeals upheld the trial court's application of the statutory provisions. *See Cordova,* 986 P.2d at 979. We agree with the court of appeals that the trial court properly applied the "endanger life or property" condition of the traffic code to the emergency vehicle exception.[8]

### 1.

As previously noted, the emergency vehicle exception of section 24–10–106(1)(a) grants immunity to emergency vehicle operators who comply with section 42–4–108(2). As pertinent to this case, section 42–4–108(2)(c) gives emergency vehicle operators the privilege of exceeding the lawful speed limits only "so long as said driver does not endanger life or property." Corsentino argues that the "endanger life or property" condition applies only to the traffic code and has no bearing on the emergency vehicle exception of the GIA.[9]

In support of his argument that the "endanger life or property" condition does not work to exclude an emergency vehicle operator from the emergency vehicle exception, Corsentino relies on our decision in *City of Grand Junction v. Sisneros,* 957 P.2d 1026 (Colo.1998). Before the case reached us, the court of appeals held that the GIA provides immunity to emergency vehicle operators "only in those instances in which [section 42–4–108(2)] immunizes the driver of the vehicle from prosecution for a traffic offense." *Sisneros v. City of Grand Junction,* 940 P.2d 984, 986 (Colo.App.1996). We reversed the court of appeals' decision, rejecting its holding that the tort immunity of the emergency vehicle exception is limited to those cases where the emergency vehicle operator has immunity against the prosecution of the traffic violations referred to in section 42–4–108(2). *See Sisneros,* 957 P.2d at 1029.

Corsentino reads *Sisneros* as holding that the immunity granted to emergency vehicle operators extends beyond the violations immunized under section 42–4–108(2)(a) to (d). Because we held in *Sisneros* that the immunity under the emergency vehicle exception is not limited to the violations listed in subsections (a) to (d) of section 42–4–108(2), Corsentino concludes that the conditions of subsections (b) and (c), slowing down when running a stop signal and not endangering life or property when speeding, have no effect on immunity under the emergency vehicle exception. We disagree with this conclusion drawn from our holding in *Sisneros.*

In *Sisneros,* a fire truck was responding to an emergency call when an eight-foot section of hard suction hose fell from the truck onto the highway. *See* 957 P.2d at 1027–28. While driving down the same highway, Sisneros struck the hose, suffering personal injuries and damage to his car. *See id.* at 1028. The trial court dismissed the action holding that the immunity under the GIA barred the

---

8. Because the issue before us is whether the court of appeals properly applied the "endanger life or property" condition to the immunity provisions of the GIA, we do not address whether the trial court's finding of fact that Cortese endangered life and property is correct. For purposes of our review, we accept this factual finding as correct.

9. We note that section 42–4–108(2)(b) also provides a condition for the privilege it grants to emergency vehicle operators. This section allows emergency vehicle operators to proceed past a stop sign or red light "only after slowing down as may be necessary." § 42–4–108(2)(b).

suit, and the court of appeals reversed. *See id.*

Initially, we distinguish *Sisneros* from this case because the plaintiffs in *Sisneros* did not allege that the fire truck committed any of the violations listed in subsections (a) to (d) of section 42–4–108(2). That is, there was no allegation that the operator of the fire truck was speeding, disregarding a stop signal, or disregarding regulations governing traffic directions. On the contrary, unlike in this case, the plaintiffs in *Sisneros* expressly asserted that the fire truck operator was not committing any of the violations referred to in subsections (a) to (d) of section 42–4–108(2). They did so because, according to their reading of the statute, the emergency vehicle exception granted immunity only in those situations described in subsections (a) to (d). That is, only when an emergency vehicle operator is parked, speeding, running a stop signal, or disregarding the direction of traffic does that operator qualify for immunity under the emergency vehicle exception. *See* Plaintiff's Response Brief at 5, *Sisneros* (No. 96SC830). We rejected this approach to the GIA and held that the immunity granted by the GIA extends beyond the violations listed in section 42–4–108(2).

Given these circumstances surrounding the case, we do not read *Sisneros* as holding that the conditions of subsections (b) and (c) of section 42–4–108(2) do not apply to the immunity provisions of the GIA. *Sisneros* did not address the relationship between these conditions and the immunity provisions of the GIA. Instead, *Sisneros* was concerned with conduct outside of section 42–4–108(2). Therefore, we disagree with Corsentino that *Sisneros* applies to the issue raised in this case.

Because we did not address the conditions of subsections (b) and (c) of section 42–4–108(2) in *Sisneros*, we ignored the 1996 amendments to section 42–4–108(3), expressly referring to these conditions at issue in the case before us now. Since the underlying facts in *Sisneros* took place in 1995, we cited the 1995 version of the statute. *See* 957 P.2d at 1028. Although we ignored the 1996 amendments to section 42–4–108(3) in *Sisneros*, the court of appeals cited the 1996 amended version of section 42–4–108(3) in its opinion, noting that the statute had not un-

dergone any changes. *See Sisneros,* 940 P.2d at 985–86. Because we now interpret the 1996 amendments as clarifications of the statute, we agree with the observation of the court of appeals that the statute had not undergone any changes despite the 1996 amendments. *See id.* at 985. Moreover, there being no change in the statute, it was also proper for us to cite to the 1995 version.

■ We have recognized that amendments to a statute either clarify the law or change it. *See Douglas County Bd. of Equalization v. Fidelity Castle Pines, Ltd.,* 890 P.2d 119, 125 (Colo.1995). There is a presumption that the legislature intends to change the law when it amends a statute. *See id.* This presumption can be rebutted by showing that the legislature only intended to clarify an ambiguity with the amendment. *See id.* Thus, if an amendment clarifies the law, the law remains unchanged by the amendment. *See* 1A Norman J. Singer, *Sutherland Statutory Construction* § 22.30, at 268 (5th ed.1992) (when amendment clarifies only, it may be relied on to determine what rights exist under the original act).

■ When determining whether an amendment clarifies or changes a statute, courts look to the amendment's plain language and legislative history. *See Swieckowski v. City of Fort Collins,* 934 P.2d 1380, 1385 (Colo.1997). As amended, the section reads, "The exemptions *and conditions provided* in paragraphs (b) to (d), *in their entirety,* of subsection (2) of this section *for* an authorized emergency vehicle shall *continue* to apply *to section 24–10–106(1)(a), C.R.S.* ..." § 42–4–108(3) (added language underscored).

Here the plain language of the 1996 amendments indicates that, in enacting the amendments, the General Assembly simply sought to clarify that the "endanger life or property" condition of section 42–4–108(2)(c) applies to the emergency vehicle exception provisions. The key word "continue" indicates that the conditions of section 42–4–108(2) applied to the immunity provisions both before and after the 1996 amendments. The phrase "in their entirety," referring to the conditions of subsections (b) to (d) of section 42–4–108(2), erases any doubt about

whether the conditions apply to the immunity provisions.

The comments made by Senator Thiebaut, author of the amendments, at the Senate Judiciary Committee Hearing support our understanding that the amendments are clarifications. At the hearing, he indicated that he included the phrase "in their entirety" because "some people don't read the whole thing, only parts of it when they are interpreting" section 42–4–108(2) for purposes of immunity. *Hearing on S.B. 96–068 Before the Senate Judiciary Committee,* 60th Gen. Assembly, 2nd Reg. Sess. (Audio Hearing Tape Jan. 23, 1996) (statement of Sen. Thiebaut). In amending the statute, Senator Thiebaut simply sought to restate "the obvious, and that is, we want emergency vehicles to *continue* acting according to [section 42–4–108(2) ], and that when they act according to the statute, they have immunity to so act, and that is ... the purpose of this amendment." *Id.* (emphasis added). Thus, it was to clarify the statute and avoid misleading interpretations that Senator Thiebaut proposed these amendments to section 42–4–108(3).

The plain language and legislative history demonstrate that the 1996 amendments merely clarified the law. Moreover, the 1996 amendments to section 42–4–108(3) show a clear intent to apply the condition of section 42–4–108(2)(c) to the emergency vehicle exception of the GIA. Thus, accepting Corsentino's argument that the conditions of section 42–4–108(2) do not apply to the provisions of the GIA would ignore these amendments in their entirety.

The 1996 amendments also highlight the flaws of Corsentino's argument that applying the "endanger life or property" condition to the immunity provisions would disrupt the scheme of the GIA. Specifically, he argues that applying the conditions of section 42–4–108(2) to the immunity provisions of the GIA would conflict with the indemnification provisions of the GIA.

Under section 24–10–110(1)(b)(II), 7 C.R.S. (1999), a public entity must indemnify its employees for:

> [t]he payment of all judgments and settlements of claims against any of its public employees where the claim against the public employee arises out of injuries sustained from an act or omission of such employee ... when the public employee is operating an emergency vehicle within the provisions of section 42–4–108(2) and (3), C.R.S.

As such, when the employee is not operating under the provisions of section 42–4–108(2) and (3), the public entity has no obligation to indemnify, and the employee is personally liable. Applying the conditions of section 42–4–108(2) to limit the indemnification provisions, as we do with the immunity provisions, would make an emergency vehicle operator personally liable for any injuries caused while speeding if she endangers life or property. In such cases, section 24–10–110–(1)(b)(II) would free the public entity from its obligation to indemnify her, while section 24–10–106(1)(a) would waive immunity for the public entity.

The 1996 amendments to section 42–4–108(3), however, show that the legislature did not intend this result and that this tension does not exist. By referring only to section 24–10–106(1)(a), the General Assembly chose not to apply the conditions of section 42–4–108(2) to the indemnification provisions of section 24–10–110(1)(b)(II). *See* § 42–4–108(3). As such, if an operator speeds and endangers life or property in violation of section 42–4–108(2)(c), then the public entity does not have immunity, but is liable for any claims against the operator of the emergency vehicle. Consequently, only when the operator's acts causing the injuries are willful and wanton is the operator personally liable. *See* § 24–10–110(1)(b)(II).

2.

Having decided that the "endanger life or property" condition limits the immunity granted to emergency vehicle operators through the GIA's emergency vehicle exception, we now explain how a trial court is to determine whether an emergency vehicle operator endangered life or property while speeding.

We acknowledge the legitimate concerns raised by Corsentino that courts may conclude per se that an emergency vehicle operator endangered life or property by causing

damage or being involved in an accident while exceeding the speed limit. This per se rule in turn would lead to a de facto abrogation of the immunity granted to emergency vehicle operators because the only time emergency vehicle operators need to invoke immunity is when they cause damage or are involved in an accident. Ironically, the immunity would be waived only in those situations when the emergency vehicle operators need it.

■ This argument, however, reveals a misunderstanding of the term "endanger," by confusing the concept of the term with the result of the conduct. The term "endanger" suggests a certain degree of risk created by the conduct of the emergency vehicle operator. By its nature, endangerment looks at the surrounding circumstances, both prior to and at the time the accident occurs, in conjunction with the conduct in question. The ultimate result does not figure into the concept of endangerment. Rather, the pertinent question is whether the emergency vehicle operator's speed created an unreasonable risk of injury or damage to life or property.

As such, when determining whether an emergency vehicle operator endangered life or property, courts must not consider the accident or actual damage. Similarly, whether the emergency vehicle operator was responding to an actual emergency has no bearing on a court's determination of whether she endangered life or property. Instead courts should limit their inquiry to the relationship between the conduct of the emergency operator prior to the accident and the circumstances surrounding the conduct.

■ Important factors relating to the circumstances include, but are not limited to, the legal speed limit in the area, the speed at which the operator was driving, the conditions of the road, and the type of area in which she was driving.

■ In this case, the trial court used this standard in finding that Cortese endangered life and property while speeding. Although the trial court stated that the mission did not justify the officer's speed and manner of driving, it did not base its finding of endan-

germent on the mission. In its written order, the trial court relied upon the fact that the intersection where the accident occurred was located in a residential area. The trial court also noted the line-of-sight problems caused by the overgrowth of trees and bushes on the median at the intersection. Under these conditions, the trial court concluded that Cortese endangered life and property by driving approximately 60 m.p.h. in a 35 m.p.h. speed zone.

Because the trial court applied the proper legal standard in finding that Cortese endangered life and property, we uphold its ruling that governmental immunity does not bar this action.

### III.

In conclusion, the trial court erred in finding that Cortese was not responding to an emergency call by failing to make that determination from the perspective of a reasonable emergency vehicle operator. However, the trial court correctly considered the circumstances prior to and at the time of the accident in finding that Cortese did not fall within the emergency vehicle exception because his excessive speed of travel endangered life and property. We therefore affirm the decision of the court of appeals upholding the trial court's ruling that Cortese endangered life and property and that he and the Pueblo County Sheriff are therefore subject to potential liability in tort. We remand the case to the court of appeals to return it to the trial court for proceedings consistent with this opinion.