2014 CO 34

**Marilyn DANIEL, Petitioner,**

v.

**CITY OF COLORADO SPRINGS, a Colorado municipal corporation and home rule city, Respondent.**

**Supreme Court Case No. 12SC908**

Supreme Court of Colorado.

May 19, 2014

Attorneys for Petitioner: Carter Law Group, LLC, Michael J. Carter, Denver, Colorado, Burg Simpson Eldredge Hersh & Jardine, P.C., Nelson Boyle, Englewood, Colorado

Attorneys for Respondent: Christopher J. Melcher, City Attorney/Chief Legal Officer,

W. Erik Lamphere, Attorney, Colorado Springs, Colorado

Attorneys for Amicus Curiae Colorado Trial Lawyers Association: Cross & Bennett, L.L.C., Joseph F. Bennett, Denver, Colorado

Attorneys for Amicus Curiae Colorado Municipal League: Light, Kelly & Dawes, P.C., Sophia Hua Tsai, Kelly L. Kafer, Denver, Colorado

CHIEF JUSTICE RICE delivered the Opinion of the Court.

¶1 We granted certiorari to consider an issue of first impression: whether a party injured in a public golf course's parking lot can fulfill the requirements of the "recreation area waiver," section 24–10–106(1)(e), C.R.S. (2013), of the Colorado Governmental Immunity Act ("CGIA").[1] To resolve this issue, we specifically analyze whether a parking lot serving a public golf course qualifies as a "public facility" and whether such a parking lot is "located in" a "recreation area."

¶2 We hold that a parking lot that serves a public golf course is a "public facility" under the recreation area waiver. Such a parking lot is "public" if it is accessible to and operated for the benefit of the general public; it is also a "facility" in light of the CGIA's history and its purposes. Accordingly, we reverse the judgment of the court of appeals, as the court of appeals erred in categorically holding that the recreation area waiver did not apply to this type of public parking lot.

¶3 Additionally, we hold that a three-step analysis should be employed to determine whether a public facility is "located in" a "recreation area." First, we look to the underlying piece of contiguous public property to determine which specific portions of that property should be considered a "putative recreation area." Second, we determine if the public entity's primary purpose in building or maintaining that recreation area was the promotion of recreation. Third, we determine if the public facility at issue was located within the boundaries of that recreation area. Applying that analysis here, we conclude that the golf course grounds—including the parking lot—is a "recreation area" and that the parking lot at issue was "located in" this area.

¶4 Because we lack sufficient facts, however, to determine if the other requirements of the recreation area waiver are met, we remand for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶5 In August of 2009, Respondent, Marilyn Daniel, drove to the Valley Hi Golf Course ("Valley Hi"), a public golf course located in Colorado Springs, Colorado. She planned to see Congressional Representative Doug Lamborn speak at a community event that was scheduled to take place at Valley Hi's clubhouse. Instead of parking her vehicle in the parking lot that was located next to the clubhouse, Daniel parked on a street about a block away from the golf course. As Daniel crossed through the Valley Hi parking lot en route to the clubhouse, she stepped in a hole, fell, and fractured her hip. As a result of her injuries in the Valley Hi parking lot, Daniel sued Petitioner, the City of Colorado Springs ("City"), in a premises liability action.

¶6 Thereafter, the City filed a Motion to Dismiss ("Motion") pursuant to C.R.C.P. 12(b)(1), arguing that the trial court lacked subject matter jurisdiction because Valley Hi was owned by the City, a public entity that is immune from liability under the CGIA. *See* § 24–10–102, C.R.S. (2013) (stating that public entities should be held liable "only to such an extent and subject to such conditions as are provided by this article"); § 24–10–103(5), C.R.S. (2013) (defining "public entity" in relevant part as "any … city"). In response, Daniel argued that the City had waived its immunity under the CGIA's recreation area waiver, which subjects public enti-

---

1. We granted certiorari to review the following issue:

Whether a public golf course parking lot is a public facility located in any park or recreation area under section 24–10–106(1)(e), C.R.S. (2013), of the Colorado Governmental Immunity Act.

ties to liability for injuries resulting from a "dangerous condition of any ... public facility located in any park or recreation area maintained by a public entity." § 24–10–106(1)(e). According to Daniel, the hole in the parking lot was a "dangerous condition" and the parking lot was a "public facility" "located in" the "recreation area" that was the golf course grounds.

¶ 7 In a July 13, 2011 Order Denying Defendant's Motion to Dismiss ("Order"), the trial court summarily denied the City's Motion "for the reasons and analysis (and the legal authorities) contained in [Daniel's] Response." Importantly, the trial court conducted no fact finding to guide its immunity determination.[2]

¶ 8 The City subsequently brought an interlocutory appeal pursuant to section 24–10–108, C.R.S. (2013), arguing that the trial court erred in denying its Motion. A division of the court of appeals agreed with the City and unanimously reversed the trial court's Order. See Daniel v. City of Colo. Springs, 2012 COA 1772, ¶ 16, 328 P.3d 234. The court of appeals relied almost exclusively on Jones v. City & County of Denver, 833 P.2d 870 (Colo.App.1992), to determine that the City did not waive immunity. See id. at ¶¶ 12–14. The court of appeals noted that Daniel's injury occurred in a parking lot and, per Jones, parking lots are not covered by the recreation area waiver. ¶¶ 13–14.

¶ 9 We granted certiorari review and now reverse the judgment of the court of appeals.

## II. Standard of Review

¶ 10 Governmental immunity implicates issues of subject matter jurisdiction, which are determined in accordance with C.R.C.P. 12(b)(1). Swieckowski v. City of Ft. Collins, 934 P.2d 1380, 1383–84 (Colo.1997). If the relevant facts underlying a trial court's jurisdictional findings are undisputed and the

issue presents a question of law, then appellate review is de novo. Medina v. State, 35 P.3d 443, 452 (Colo.2001). Here, our review is de novo because the court of appeals' holding turns on its interpretation of the CGIA's recreation area waiver, a question of law. See Fogg v. Macaluso, 892 P.2d 271, 273 (Colo.1995) (noting that the construction of a statute is a question of law subject to independent review by the appellate court).

## III. Analysis

¶ 11 This case requires us to construe the CGIA's recreation area waiver. In interpreting statutes, our primary task is to ascertain and give effect to the legislature's intent, the polestar of statutory construction. State v. Nieto, 993 P.2d 493, 506 (Colo.2000). We seek to effectuate legislative intent by construing the statute as a whole, giving consistent, harmonious, and sensible effect to all of the statute's parts. See Elgin v. Bartlett, 994 P.2d 411, 416 (Colo.1999).

¶ 12 If a statute is unambiguous, we give effect to the statute's plain and ordinary meaning and look no further. See Springer v. City & Cnty. of Denver, 13 P.3d 794, 799 (Colo.2000). In contrast, if the statutory language is ambiguous (i.e., if it lends itself to alternative constructions or if its intended scope is unclear), we may look beyond the statute's plain language and examine pertinent legislative history to discern legislative intent. See People v. Terry, 791 P.2d 374, 376 (Colo.1990); see also § 2–4–203, C.R.S. (2013) (stating that the court may consider several things when a statute is ambiguous, including the legislative objective of a particular statute, former statutory provisions, and the consequences of a particular construction).

¶ 13 Before analyzing Daniel's claim, it is important to highlight the overarching

2. The record here was sparse not only by virtue of the trial court's single-sentence Order, but also because the trial court chose not to hold an optional evidentiary hearing pursuant to Trinity Broadcasting of Denver, Inc. v. City of Westminster, 848 P.2d 916, 924–25 (Colo.1993). For the purposes of our analysis, however, we assume that the facts alleged in Daniel's Complaint are true. See Springer v. City & Cnty. of Denver, 13

P.3d 794, 799 (Colo.2000) (taking the allegations in the complaint as true for the purposes of determining whether the injured party established that a public entity waived immunity under the CGIA). Importantly, this assumption reflects the City's concessions below, including its concession that the parking lot at issue served the golf course and was located on Valley Hi's property.

purposes of the CGIA. The CGIA serves as a general shield from tort liability for public entities. *See* § 24–10–108 ("Except as provided in sections 24–10–104 to 24–10–106, sovereign immunity shall be a bar to any action against a public entity for injury which lies in tort or could lie in tort. . . ."). Despite the CGIA's protective function, the legislature has carved out several waivers that, when applicable, automatically render public entities vulnerable to tort liability. *See* § 24–10–106(1)(a)–(h) (providing that public entities are immune in tort actions "except as provided otherwise in this section" and thereafter listing the immunity waivers); § 24–10–107, C.R.S. (2013) (noting that when an immunity waiver applies, "liability of the public entity shall be determined in the same manner as if the public entity were a private person"). Because governmental immunity under the CGIA is in derogation of Colorado's common law, we narrowly construe the CGIA's immunity provisions, and as a logical corollary, we broadly construe the CGIA's waiver provisions. *Springer*, 13 P.3d at 798 (discussing the history of this Court's abrogation of Colorado's common law of governmental immunity in 1971, the legislature's subsequent enactment of the CGIA in response to this abrogation, and the rule to broadly construe the CGIA's waiver provisions). Broadly construing the CGIA's waiver provisions permits parties to seek redress for injuries caused by a public entity, "one of the basic but often overlooked" purposes of the CGIA. *State v. Moldovan*, 842 P.2d 220, 222 (Colo.1992).

¶ 14 With the principles of statutory construction and the purposes of the CGIA in mind, we now turn to the recreation area waiver outlined in section 24–10–106(1)(e), which subjects public entities to liability when an injury is the result of a "dangerous condition of any . . . public facility located in any . . . recreation area maintained by a public entity." § 24–10–106(1)(e). To successfully waive immunity under the recreation area waiver, a plaintiff must demonstrate: (1) that his or her injury occurred in or on a "public facility"; (2) that the public facility was "located in" a "recreation area"; (3) that the public facility was "maintained by" a public entity; and (4) that a "dangerous condition" existed and caused an injury in or on the public facility. Because the issue in this case implicates the first two requirements directly, we address both in turn. We lack an adequate factual record, however, regarding the third and fourth requirements, and thus remand for further factual findings regarding those requirements.

### A. The Valley Hi Parking Lot Is a "Public Facility"

¶ 15 To determine whether a parking lot serving a public golf course qualifies as a "public facility," we first address whether such a parking lot is "public" under the recreation area waiver. We hold that the lot was "public" because it was accessible to and beneficial to the general public. We next determine whether it was a "facility" under that waiver. We hold that a parking lot qualifies as a "facility" because the CGIA's history and its purposes indicate that public parking lots can fulfill the recreation area waiver's "facility" requirement.

¶ 16 We begin our analysis of the "public facility" requirement by determining whether the parking lot here was "public" for the purposes of the recreation area waiver.[3] To decipher the meaning of "public," we look beyond the text of the CGIA, which does not define the term "public facility." Additionally, because there is no plain and ordinary meaning for the term "public facility" and because its meaning is ambiguous, *St. Vrain Valley School District RE–1J v. A.R.L.*, 2014 CO 33, ¶ 16, 325 P.3d 1014, we turn to appellate precedent for guidance. Our previous interpretation of the term "public water facility" under another CGIA waiver, section 24–10–106(1)(f),[4] C.R.S. (2013), in *City & County of Denver v. Gallegos*, provides helpful guidance for determining whether the "public"

---

**3.** The City does not seem to contest that Valley Hi and its parking lot were "public." We nonetheless address the "public" requirement to clarify this aspect of the recreation area waiver.

**4.** This provision waives immunity for the "operation and maintenance of any public water facility, gas facility, sanitation facility, electrical facility, power facility, or swimming facility by such public entity." § 24–10–106(1)(f).

requirement was met here. 916 P.2d 509, 511 (Colo.1996), *overruled in part for other reasons by Corsentino v. Cordova,* 4 P.3d 1082, 1086 (Colo.2000). In *Gallegos,* we considered whether water meter pits installed by a public entity on private properties were (1) accessible to the public, and (2) operated for the benefit of the public, in ultimately holding that such pits were not "public" water facilities. *Id.* at 511–12.

■ ¶ 17 Applying our rationale in *Gallegos* here, we conclude that the parking lot at issue is "public." First, the parking lot was accessible to the general public. Valley Hi is not a "members-only" golf course, which presumably means that the general public can park vehicles in the parking lot before commencing a game of golf, visiting the professionals' shop, or attending community events in the clubhouse. Second, because the parking lot provides visitors to the clubhouse and golf course a convenient place to park their vehicles, the parking lot is operated for the benefit of the public. The parking lot therefore qualifies as "public" under the recreation area waiver.

■ ¶ 18 Because the parking lot is "public," we now determine whether the parking lot is also a "facility." The term "facility" is ambiguous, *St. Vrain,* ¶ 16, thereby justifying our use of various tools of statutory interpretation to discern legislative intent. Relying on the history of the statute and the purposes of the CGIA, we conclude that the parking lot constituted a "facility" for the purposes of the recreation area waiver.

¶ 19 To guide our interpretation of the term "facility," we first look to the legislative history of the recreation area waiver. In 1986, the Colorado legislature amended section 24–10–106(1)(e). *See* Act of Apr. 29, 1986, ch. 166, sec. 5, § 24–10–106(1)(e), 1986 Colo. Sess. Laws 873, 876. This amendment provides compelling evidence that the legislature intended that parking lots can qualify as public facilities under the recreation area waiver. Prior to 1986, section 24–10–106(1)(e) waived immunity for injuries resulting from a "dangerous condition of any public facility, *except* roads and highways located in parks and recreation areas, *public parking facilities,* and public transportation facilities

maintained by a public entity." Colorado Governmental Immunity Act, ch. 323, sec. 1, § 130–11–6(1)(f), 1971 Colo. Sess. Laws 1204, 1206 (later codified at § 24–10–106(1)(e)) (emphasis added). In other words, under the prior version of the recreation area waiver, public entities *waived* immunity for injuries resulting from a dangerous condition of "any" public facility (i.e., all public facilities), but *retained* their immunity under the exception if injuries occurred in a public parking facility. Then, in 1986, the legislature amended the recreation area waiver to its current form and *removed* this public parking facilities exception, thereby subjecting public entities to liability for injuries resulting from a dangerous condition of any public facility "located in any park òr recreation area." Act of Apr. 29, 1986, ch. 166, sec. 5, § 24–10–106(1)(e), 1986 Colo. Sess. Laws 873, 876.

■ ¶ 20 We conclude that the legislature's removal of the public parking facilities exception from section 24–10–106(1)(e) signaled its intent that the term "public facility" include public parking lots. Our conclusion flows from the well-established presumption that when the legislature amends a law, it intends to change that law. *See City of Colo. Springs v. Powell,* 156 P.3d 461, 465 (Colo. 2007). Thus, the legislature's removal of particular language serves as a statement of legislative intent that it did not wish to include such language. *Specialty Rests. Corp. v. Nelson,* 231 P.3d 393, 397, 402 (Colo.2010); *see also Town of Telluride v. Lot Thirty-Four Venture, L.L.C.,* 3 P.3d 30, 35 (Colo. 2000) (noting that we do not read statutes to *create exceptions* that the plain language of the statute does not suggest, warrant, or mandate). Accordingly, contrary to the court of appeals' holding, governmental immunity can be waived if an injury results from a dangerous condition of a public parking lot, so long as that parking lot is "located in" a "recreation area." Given our conclusion regarding the effect of the 1986 amendment, we overrule *Jones,* 833 P.2d at 872, to the extent that it misconstrued this amendment as evidence that the legislature intended to

retain, rather than remove, the exception.[5]

¶ 21 Our conclusion that the legislature intended "facility" to include parking lots is further bolstered by the CGIA's objectives and our command to broadly construe its waiver provisions. *See Padilla v. Sch. Dist. No. 1*, 25 P.3d 1176, 1181 (Colo.2001) (holding that the term "physical condition" in the CGIA should be construed to have a "broad scope" because we "afford deferential construction to immunity waivers in the CGIA"). Although the CGIA was designed to protect public entities from tort liability, the legislature also acknowledged that governmental immunity can be "inequitable" in some instances. *See* § 24–10–102. By providing the waivers (i.e., permitting tort recovery in certain circumstances), the legislature sought to temper these possible inequities. *See Moldovan*, 842 P.2d at 222 (explaining that the purposes of the CGIA include not only immunizing public entities from liability but also permitting certain plaintiffs "to seek redress for personal injuries caused by a public entity"). We have consistently rejected strict constructions of CGIA waivers where such constructions would improperly vitiate the practical operation of those waivers. *See, e.g., Springer*, 13 P.3d at 801–02 (holding that a public entity is liable for the work of an independent contractor under the CGIA and explaining that a contrary conclusion would effectively nullify a CGIA waiver because a "public entity could simply hire an independent contractor ... and escape answering for injuries to citizens using its buildings"); *Tidwell v. City & Cnty. of Denver*, 83 P.3d 75, 86 (Colo.2003) (interpreting a CGIA waiver term broadly because "we cannot interpret a term to withhold a waiver without clear legislative intent"). Here, narrowly interpreting "facility" would undermine the practical effect of the recreation area waiver for plaintiffs who are injured in parking lots, which are common features of modern life.

¶ 22 Because the parking lot serving Valley Hi's public golf course is both "public" and a "facility," we hold that the parking lot meets the "public facility" requirement under the recreation area waiver; accordingly, we next consider whether the parking lot was "located in" a "recreation area."

## B. The Valley Hi Parking Lot Is "Located In" a "Recreation Area"

¶ 23 Having held that the Valley Hi parking lot is a "public facility," we next determine whether the parking lot is "located in" a "recreation area." We hold that in determining whether a particular piece of property is "located in" a "recreation area," we employ a three-step analysis. First, we determine what property is relevant to our analysis (i.e., what property constitutes the "putative recreation area"). To do this, we include any contiguous areas of public property that plausibly promote recreation and exclude any areas that clearly do not promote recreation. Second, if the recreation area is employed for mixed purposes (i.e., both recreational and non-recreational purposes), we determine if the public entity's "primary purpose" in constructing or maintaining the area was the promotion of recreation. Third, if we conclude that the primary purpose was the promotion of recreation, we then determine whether the public facility at issue is "located in" the boundaries of the recreation area.

¶ 24 As a first step in determining whether a public facility is "located in" a "recreation area," we must decide which portions of a parcel of public property could plausibly be considered the "recreation area." This hypothetical determination is necessary to our analysis, because a cursory examination of the metes and bounds of public property ownership is not necessarily enough to determine if a given piece of property constitutes a "recreation area." The plain language of the recreation area waiver does not require that the boundaries of the recreation area perfectly overlap with the public entity's property lines. *See* § 24–10–106(1)(e). Rather, the waiver implies that the recreation area can be *smaller than* the bound-

---

**5.** *Jones'* ultimate holding—that immunity was not waived by the City of Denver under section 24–10–106(1)(e)—was correct, because the plaintiffs were injured in an *airport* parking lot. 833 P.2d at 871–72. An airport parking lot is not "located in a park or recreation area," nor is it any of the other facilities listed in section 24–10–106(1)(e). Thus, the waiver was inapplicable.

aries of the public property, as long as the public facility is "located in" that "recreation area." *Id.* For example, if a public entity owned a large piece of property and located a public electrical facility immediately adjacent to a public golf course (such that both the golf course's grounds and the public electrical facility's grounds were located on a single, contiguous piece of public property), the existence and proximity of the electrical facility would not render the golf course's grounds any less of a "recreation area." Because the electrical facility itself was not designed with the purpose of "recreation" in mind (rather, it was designed for the purpose of producing electricity), we would exclude the electrical facility from the putative recreation area and consider only the other contiguous areas of the public property that plausibly promote recreation.

¶ 25 Applying this test here, the golf course itself obviously promotes recreation, i.e., golfing, so the boundaries of the golf course should be included in the putative recreation area. Additionally, the parking lot promotes recreation by allowing golfers a convenient place to park after transporting themselves and their golf clubs to the golf course. While a vehicle is not absolutely necessary to play golf, a parking lot next to a golf course clearly promotes golfing. The clubhouse also promotes recreation by allowing, for example, golfers to use convenient restrooms before or after play or to purchase golfing supplies (e.g., golf balls or golf clubs) in a convenient location. Thus, the putative recreation area here includes the boundaries of the golf course itself, the parking lot at issue, and the golf clubhouse, as all of these areas plausibly promote recreation.

¶ 26 After determining what is included in the putative recreation area, we determine whether the "primary purpose" of that area was the promotion of recreation. The word "area" is defined as "a definitely bounded piece of ground *set aside for a specific use or*

*purpose." Webster's Third New International Dictionary* 115 (2002) [hereinafter *Webster's*] (emphasis added). As the definition of "area" suggests, to determine whether a given putative recreation area in fact qualifies as a "recreation area," we examine the "specific use or purpose" for which the property was "set aside" and whether that "specific use or purpose" was recreation. Where, as here, the property serves multiple purposes,[6] our analysis focuses on the public entity's *primary*[7] purpose in constructing or maintaining the area in question and whether that primary purpose promoted recreation. Accordingly, a recreation area can have other, non-recreational purposes, but the *principal*—i.e., primary—purpose must be recreational. *See St. Vrain,* ¶ 32 (explaining that although there are hypothetical non-recreational purposes for a playground, the primary purpose of a school in constructing or maintaining a playground is to allow children to play, i.e., engage in recreation).

¶ 27 Importantly, in determining the primary purpose, we examine the *public entity's* objective primary purpose in constructing or maintaining the recreation area based on the totality of the circumstances. Thus, an *injured individual's* purpose in visiting the recreation area where he or she was injured is irrelevant. Our examination of the public entity's primary purpose—rather than the injured individual's purpose—reflects the thrust of the waivers, which focus exclusively on the public entity's duties to maintain its premises in a safe manner and to discover and correct dangerous conditions that could cause injuries. *See* § 24–10–106(1)(a)–(h) (exclusively mentioning the duties of the public entity); § 24–10–103(1.3), C.R.S. (2013) (defining a "dangerous condition" in part as a condition "known to exist or which in the exercise of reasonable care should have been known to exist" by the public entity and which "condition is proximately caused by the negligent act or omission of the public entity"). The waivers do not focus on the

---

6. Valley Hi promoted multiple purposes, some of which were recreational (e.g., the recreational purpose of golfing was facilitated by the provision of golf carts and the sale of golf equipment in the professionals' shop), and some of which were non-recreational (e.g., the non-recreational purpose of providing space for community events

was facilitated by making the clubhouse available for such events).

7. "Primary" is defined as "first in rank or importance: CHIEF, PRINCIPAL." *Webster's* at 1800.

injured individual's duties, or on the injured individual's right to compensation. *Id.* Thus, a public entity owes the same duty to an individual injured by a dangerous condition "located in" a "recreation area" regardless of the idiosyncratic reasons why that individual might have visited the recreation area.

¶ 28 Our focus on the public entity's purpose is also supported by our mandate to construe the CGIA's waiver provisions to compensate victims of government negligence, because examining the injured individual's intent could effectively eliminate the operation of the recreation area waiver for some injured parties. *See Springer*, 13 P.3d at 801–02 (rejecting a construction of a CGIA waiver that would effectively nullify the operation of that waiver). Our public-entity focus is also consistent with legislative intent, because this focus encourages public entities to safely maintain their premises for *all* visitors. *See id.* at 803 (explaining that the legislative intent in creating the public building waiver "was to protect members of the public from unreasonable health and safety risks by encouraging public entities to construct and maintain their buildings for safe use by the persons who use them").

¶ 29 Applying the primary purpose test to determine if the putative recreation area here, which includes the parking lot, qualifies as a "recreation area," we conclude that Daniel satisfies this requirement. As the name of the property suggests, the primary purpose of the Valley Hi Golf Course is the promotion of recreation—i.e., the promotion of golf. Beyond the name of the property, the zoning code that the City would have needed to follow in constructing Valley Hi's parking lot also suggests that the primary purpose of the putative recreation area was recreation. Specifically, the zoning code explicitly ties the required number of parking spaces to the number of holes on the golf course. *See* Colo. Springs, Colo., Code § 7.4.203(A) (2013) [hereinafter *Zoning*

*Code*] (providing "minimum off street parking requirements for specific uses" and requiring that golf courses provide "4 [parking] spaces per hole").[8]

¶ 30 Because we have concluded that the City's primary purpose in building and maintaining the golf course property was to promote recreation, we next determine whether the parking lot (i.e., the "public facility" at issue) was "located in" the recreation area at issue. In making this determination, we look to whether the public facility was located within the boundaries of the recreation area. Here, the parking lot was so located, because the parking lot was on the Valley Hi property and adjacent to the clubhouse. Accordingly, Daniel satisfies the "located in" requirement.

¶ 31 In sum, we hold that the parking lot at issue was "located in" a "recreation area."

### IV. Conclusion

¶ 32 We hold that a parking lot that serves a public golf course is a "public facility" under the recreation area waiver. The parking lot is "public" because it is accessible to and operated for the benefit of the general public; it is also a "facility" in light of the CGIA's history and its purposes. Accordingly, we reverse the judgment of the court of appeals because it erroneously held that parking lots are categorically excluded from the recreation area waiver.

¶ 33 Additionally, we hold that a three-step analysis should be employed to determine whether a public facility is "located in" a "recreation area" under the recreation area waiver. First, a court should look to the underlying piece of contiguous public property to determine which specific portion of that property should be considered part of the putative recreation area, including any areas that plausibly promote recreation and excluding any areas that clearly do not promote

---

**8.** The *Zoning Code's* use of the number of holes on the golf course as the metric for the minimum number of parking spaces—as opposed to, for example, the square footage of the golf clubhouse—suggests that although Valley Hi can be used for purposes other than golfing (e.g., community events in the clubhouse), its primary purpose is golf. In contrast, the *Zoning Code* dictates that public hospitals have a minimum number of parking spaces based on the provision of medical care. *See Zoning Code* § 7.4.203(A) (providing that hospitals must provide "2 [parking] spaces per [patient] bed"). These differences in approach are illuminating, because they track the different primary purposes for each respective entity.

recreation. Second, a court should determine if the public entity's primary purpose in building or maintaining that recreation area was the promotion of recreation. Third, a court should determine if the public facility at issue was located within the boundaries of that area. Applying this analysis here, we determine that the public facility at issue, i.e., the parking lot, was "located in" the "recreation area" of the golf course's grounds.

¶ 34 Due to the very limited factual record before us, we remand for further proceedings consistent with this opinion.

JUSTICE COATS concurs in the judgment only, and JUSTICE EID joins in the concurrence.

JUSTICE COATS, concurring in the judgment only.

¶ 35 While I too believe the court of appeals misconstrued the Act in finding that it declines waiver of governmental immunity for all parking facilities, as a general category or class, and while I would similarly reverse the judgment below, I nevertheless take issue with the majority's understanding of the "park or recreation area" waiver of the statute. In particular, I disagree with the majority's newly-minted tripartite framework for assessing whether a public facility is "located in any park or recreation area maintained by a public entity," as well as its interpretation and application of the statutory terms "facility" and "public," in all three of the CGIA cases it resolves today. Unlike the majority, I believe the terms "public facility" and "recreation area," despite not being defined in the Act itself, have well-accepted meanings, which can be discerned from clear referents elsewhere in the revised statutes; the lengthy and detailed 1968 Legislative Council Report and proposed bill, from which the current Act is directly taken; and the historical trail of court opinions and corresponding amendments to the provisions of the Act. I therefore consider it both unnecessary, and unwise, to effectively rewrite the parks and recreation provision, as I believe the majority does, by mandating an analytic framework designed, by its very terms, to leave to courts, in each individual case, the

determination of the breadth and applicability of the waiver.

¶ 36 Because "public facility" appears as a separate term in the Act *only* with regard to parks and recreation areas, and because immunity is waived for a dangerous condition of an otherwise unspecified "public facility" *only* to the extent that the "public facility" in question is "located in," as distinguished from "adjacent" to or "contiguous" with, a "park or recreation area maintained by a public entity," § 24–10–106(1)(e), C.R.S. (2013), the intended meaning of the phrase "park or recreation area" would appear to be the logical starting point and key to construing the scope of the waiver. The majority's tripartite framework for analysis focuses on drawing boundaries, distinguishing primary from secondary or tertiary purposes, and engrafting on contiguous or adjacent properties, but it appears to simply presume, or better, take for granted, that a "recreation area," as contemplated by the Act, is separate and distinct from a "park" and was intended to include any space the primary purpose of which, as determined by a court in assessing its own jurisdiction under the Act, is the "promotion of" some kind of "recreation." By contrast, I believe the phrase "parks and recreation" to have long been a matter of common legal usage in this jurisdiction, both known to and intentionally chosen by the drafters to identify those public properties expressly designated and operated as parks or recreation areas by the applicable public entities themselves, according to their own governing provisions.

¶ 37 Although the Colorado Governmental Immunity Act was not enacted until 1971, following the decision of this court "simply to undo" the extensive case law of the jurisdiction recognizing and applying the doctrine of sovereign or governmental immunity, *Evans v. Bd. of Cnty. Comm'rs*, 174 Colo. 97, 105, 482 P.2d 968, 972 (1971); *see also Flournoy v. Sch. Dist. No. One*, 174 Colo. 110, 482 P.2d 966 (1971); *Proffitt v. State*, 174 Colo. 113, 482 P.2d 965 (1971), a proposed bill (from which the Act was clearly constructed), along with the report of the committee appointed to study the problem of governmental civil immunity, was submitted by the Legislative

Council to the Forty–Seventh General Assembly in September 1968, *Colo. Legislative Council, Report to the Colorado General Assembly: Governmental Liability in Colorado,* Research Publication No. 134 (1968) [hereinafter *Report*]. While it had become necessary by 1971 to first reinstate the umbrella of governmental immunity before partially waiving it, and while a number of additional exceptions were added to the original waiver provisions, the basic structure and terminology of the proposed bill were retained. *Compare Report,* at xxvii–lii (Recommended Bill to Provide for Governmental Immunity and Liability in Colorado), *with* House Bill 71–1047, 1971 Laws 1204–18 (Governmental Immunity). Since that time, a number of legislative amendments have responded to interpretational disputes and judicial decisions, including a substantial reworking of the Act in 1986, House Bill 86–1196, 1986 Colo. Sess. Laws 873–82, which gave greater emphasis to the obligation of governments to protect the public weal, *id.* at 873–74; Chuck Berry & Tami Tanoue, *Amendments to the Colorado Governmental Immunity Act,* 15 Colo. Lawyer 1191 (1986).

¶ 38 As enacted in 1971, the parks and recreation waiver, in particular, appeared in a form substantially different from the original 1968 proposal. *Compare* § 130–11–6(1)(f), C.R.S. (1963 & 1971 Supp.), *with Report,* at xxx–xxxi (Recommended Bill § 6(f)). Where the original proposal would have waived immunity for dangerous conditions of public facilities *only* to the extent those facilities were located in parks or recreation areas maintained by a public entity, and would have excepted even from that class of public facilities roads and highways, the statute as enacted actually reconfigured the language of the original proposed bill (in an unclear and confused attempt to either add exceptions to the proposed waiver or instead expand the waiver to include parking lots and transpor-

tation facilities) in such a way that it arguably created an enormously broad waiver for dangerous conditions of all public facilities, regardless of location, with exceptions only for roads and highways located in parks and recreation areas, public parking facilities, and public transportation facilities maintained by a public entity.[1] In the major overhaul of 1986, this obvious syntactical morass, which resulted in large part from the omission of a single comma, following the term "roads and highways," was corrected by converting the waiver for public facilities back into a waiver for no more than a "public facility located in any park or recreation area maintained by a public entity." *See* House Bill 86–1196, 1986 Colo. Sess. Laws 876. At the same time, the specific references to roads and highways, public parking facilities, and public transportation facilities (whatever purpose they had previously been intended to serve) were eliminated, and the existing waivers for dangerous conditions of public hospitals, jails, and public water, gas, sanitation, electrical, power, and swimming facilities were relocated from their separate provisions to create a single series of dangerous condition waivers, of which the waiver concerning parks and recreation areas became merely one element. *Id.*

¶ 39 By the time of the original study, it had become common for the statutes, city charters, and municipal ordinances of this state to use, and often marry, the terms "parks" and "recreation" in empowering governmental bodies, typically in the form of departments, districts, and boards, to acquire, or advise with regard to the acquisition of, land for park and recreational purposes. *See, e.g.,* §§ 62–19–1 to –9, C.R.S. (1963 & 1967 Supp.) (State Park and Recreation Functions); § 62–19–2 (conferring powers to acquire land for park or recreational purposes); § 62–19–3 (conferring

---

1. The following illustrates the changes made to section 6(f) of the Report's Recommended Bill in the 1971 enactment:

(f) A dangerous condition of any public facility, except roads and highways, located in parks or recreation areas, PUBLIC PARKING FACILITIES, and PUBLIC TRANSPORTATION FACILITIES maintained by such public entity.; ~~but,~~

~~n~~Nothing in this paragraph (f) OR IN PARAGRAPH (E) OF THIS SUBSECTION (1) shall be construed to prevent a public entity from asserting the defense of sovereign immunity to an injury caused by the natural condition of any unimproved property, whether or not such property is located in a park or recreation area, OR HIGHWAY, ROAD, OR STREET RIGHT–OF–WAY;

powers to adopt regulations "to protect and maintain all areas for state park and recreation purposes"); §§ 89–12–1 to –35, C.R.S. (1963 & 1967 Supp.) (Metropolitan Recreation Districts); § 89–12–2 ("A metropolitan recreation and/or park district is one to supply recreational facilities within the district."); § 89–12–4(2)(b) (mandating that a proposed district's name must include "metropolitan recreation district," "metropolitan park district," or "metropolitan recreation and park district"); § 114–1–7, C.R.S. (1963 & 1967 Supp.) (defining "recreational facility" or "recreational system" as including "such land or interest in land as may be necessary, suitable, or proper for park or recreational purposes"). Despite much amendment and consolidation, the revised statutes have continued to provide, for instance, for the creation and operation of "park and recreation districts." *See* § 32–1–1005, C.R.S. (2013). Similarly, the charters and ordinances of cities and towns regularly continue to provide for the designation, operation, and management of park and other recreational facilities through separate departments and boards, specifically charged with such responsibilities. *See, e.g., Denver, Colo., Code of Ordinances* §§ 2.4.1–2.4.7 (Parks and Recreation); § 2.4.1 (Department of Parks and Recreation created.); § 2.4.2 (Manager of Parks and Recreation.); § 2.4.3 (Board of Parks and Recreation.); § 2.4.4 (Powers and duties of Department of Parks and Recreation.).

¶ 40 It can hardly be denied that both state and local governments have long found it necessary to provide specific enabling legislation for the acquisition, operation, and maintenance of parks and recreation areas and facilities, and have generally done so through the creation of special districts or departments, or in the case of the state, by authorizing local governments to create such districts or departments under specified conditions. Presumably, even the majority would concede that the term "park" normally refers only to an area so created and maintained by an entity with the power to do so. Rather than every area the primary purpose of which is the promotion of recreation, I consider it manifest that a "recreation area maintained by a public entity," just as the case of a park, refers only to those areas designated and maintained by a public entity, according to the applicable laws and regulations of that entity, *as a recreation area.*

¶ 41 Not only does the majority's broad, court-determined definition of a recreation area make it exceedingly difficult for a public entity to know in advance the dangerous conditions for which it will be liable in civil actions and adequately insure against or otherwise plan for the use of public funds to cover such liability; but in addition to historical context, the structure and language of the waiver provision itself strongly suggest a deliberate attempt to restrict the partial waiver of sovereign immunity to facilities over the designation of which the entity maintains some control. Were the term "recreation area" intended as broadly as the majority postulates, it would have been unnecessary to separately include in the same series an express waiver for dangerous conditions of swimming facilities, the primary, if not sole, purpose for which is clearly recreation. *See* § 24–10–106(1)(e). Additionally, because sovereign immunity exists and is partially waived only with regard to public entities, separately specifying that the waiver applies only to those parks or recreation areas "maintained by a public entity" would similarly be unnecessary, except to clarify that immunity is waived only with regard to those areas designated and maintained by the entity itself as parks or recreation areas. *See id.*

¶ 42 For all intents and purposes, the scope of the waiver is meaningfully circumscribed almost entirely by its limitation to a "park or recreation area," not by its additional reference to "public facilities." The Legislative Counsel Report could not more clearly demonstrate that the term "facility" was used throughout to distinguish artificial or man-made objects from natural conditions of the property in question. *Report,* at 140 ("The committee concluded that a distinction should be made between (1) injuries caused by negligence in the construction, maintenance, failure to maintain, etc. of artificial, man-made objects (swing sets, buildings, etc.) and (2) injuries caused by the natural conditions of a park.... In short, this means that sovereign immunity does not ap-

ply with respect to man-made objects and does apply to natural objects."). This usage was not only retained by the 1971 enactment, but in 1986, with the removal of surplusage from the definition of "dangerous condition," it also became clear that "facility" is used in the Act so broadly as to describe all those things as to which a dangerous condition can even exist. *See* § 24–10–103(1.3) (" 'Dangerous condition' means either a physical condition of a facility or the use thereof. . . .").

¶ 43 While I find unpersuasive for a number of reasons the majority's vigorous attempt at historical explanation why the legislature must have intended a waiver of immunity for recreation area parking lots, primary among them being my disagreement that the statute ever made an exception for public parking facilities located in parks or recreation areas, I also, therefore, find such efforts completely unnecessary. As manmade rather than natural, a parking lot is clearly a facility within the usage of the Act.

¶ 44 Although I also do not find it particularly problematic for classification of the parking lot at issue in this case, I similarly find unpersuasive the majority's attempt to define "public" in this context in terms of accessibility and benefit to the public. For this definition, the majority relies primarily on case law in which the issue involved the operation and maintenance of a "public water facility," in which we looked to the legislature's use of the term "public facility" in a statute concerning water conservation and drought mitigation planning. *See City & Cnty. of Denver v. Gallegos,* 916 P.2d 509 (Colo.1996), *overruled in part for other reasons by Corsentino v. Cordova,* 4 P.3d 1082, 1086 (Colo.2000). While a water facility may merely have to be for the benefit of the public in order to be a "public water facility," unlike a park or recreation area, water facilities themselves cannot meaningfully be said to exist for the use and enjoyment of the public. Also unlike parks and recreation areas, with regard to which immunity is waived only for dangerous conditions of their public facilities, immunity is waived not only for dangerous conditions but also for the operation and maintenance of public water and

other designated facilities. *See* § 24–10–106(e), (f). In the context of parks and recreation areas, the limitation of waiver to "public" facilities appears to distinguish those man-made objects designed for use by the public from facilities existing instead for use by the entity, in the operation and maintenance of the park or recreation area for the benefit of the public.

¶ 45 Finally, the phrase "located in" simply cannot be understood to mean adjacent to or contiguous with. Rather, on the face of the waiver, the public facility in question must be one that is located in the park or recreation area either because it is itself managed or maintained by the entity as a component part of the park or recreation area or, if not, because it is nevertheless physically situated within the boundaries of the park or recreation area. Precisely how much and what kind of property constitutes the park or recreation area in question must be determined by reference to official designation by either the public entity itself or the department, district, or board charged by the entity with the operation and maintenance of parks and other recreation areas. Of particular significance for the current litigation, the City Code of Colorado Springs, like Denver and other cities, provides for a particular department of the city to be responsible for parks and recreation and cultural services. *Colorado Springs, Colo., City Code* § 4.1.101 (2013). Further, it provides for a Parks and Recreation Advisory Board, § 4.1.103, the power and duties of which expressly include acting in an advisory capacity to the Department and City Council in all matters pertaining to, among other things, golf courses and related facilities, § 4.1.104.

¶ 46 Unlike the majority, I would evaluate the status of the parking lot in question on the basis of its designation and treatment by the Department or City Council as a "related facility," under the management of the golf course itself. I believe this approach comports with the better construction of the provisions of the Act, as specifying the kinds of facilities for which immunity will be waived by all public entities but leaving to the entity in question the determination whether to provide such facilities, with a full

awareness that in doing so, it will not have immunity from liability.

¶ 47 Sometime after this court abolished sovereign or governmental immunity for the jurisdiction, subject to reinstatement by the legislature, we announced that the legislature's provision for the reinstatement of immunity would be construed narrowly but its provision for the partial waiver of immunity would be construed broadly. *See, e.g., Corsentino,* 4 P.3d at 1086. In light of our retreat from perhaps centuries of common law recognizing sovereign immunity, and our invitation to the General Assembly to reinstate it to the extent desired, I consider the rationale for this particular rule to be highly questionable. While rules presuming intended outcomes, even when appropriate, are universally considered merely rules of last resort, applicable only to resolve ambiguity that has proven resistant to all other aids to construction, *see BP Am. Prod. Co. v. Patterson,* 185 P.3d 811 (Colo.2008); nevertheless the impact of such a rule on cases like those before the court today is a reality that cannot be ignored.

¶ 48 Should the General Assembly continue to respond to statutory constructions with which it is dissatisfied on a piecemeal basis, rather than by providing a more systematic, and unambiguous, rationale for its waiver policy, this rule of construction will undoubtedly continue to dominate the resolution by both trial and appellate courts of individual challenges to immunity waiver. Whether our withdrawal from the field of sovereign immunity nearly a half-century ago, in favor of interpreting the General Assembly's treatment of the subject, has led to a more rational and equitable system of allocating public funds to recompense government-caused injuries must, at least in my opinion, remain for now a matter of debate.

¶ 49 Because I would reverse the judgment of the court of appeals for the reasons I have outlined rather than those of the majority, I concur in the judgment only.

I am authorized to state that JUSTICE EID joins in this concurrence.

