Opinion by JUDGE DUNN
*532 ¶ 1 Plaintiffs, Smokebrush Foundation, Katherine Tudor, and Donald Herbert Goede, III (collectively, Smokebrush), filed an action against defendant, the City of Colorado Springs (City), asserting various tort claims. Specifically, Smokebrush alleged that various contaminants had migrated from the City's property onto its property, causing damages. Claiming governmental immunity, the City moved to dismiss for lack of subject matter jurisdiction. After a hearing, the district court denied the City's motion, concluding that the City's immunity was waived under two statutory provisions of the Colorado Governmental Immunity Act (CGIA): the gas facility exception, § 24-10-106(1)(f), C.R.S.2014, and the public building exception, § 24-10-106(1)(c). The district court also concluded that these waiver provisions applied retroactively to contamination that undisputedly occurred before the CGIA was enacted.
¶ 2 We first conclude that the General Assembly did not intend to retroactively apply the CGIA's waiver provisions. We then address whether the two asserted waiver provisions apply to alleged asbestos contamination that occurred after the effective date of the CGIA. We conclude that they do not. Accordingly, we reverse the district court's order and remand with directions to grant the City's motion to dismiss.
I. Background
¶ 3 In 1890, a private company operated a coal gasification facility in Colorado Springs (the property). The City purchased the property in 1925 and continued to operate it as a coal gasification plant until roughly 1931, when the City began using natural gas. The plant then sat idle for decades until it was dismantled in the 1950s and 1960s.
¶ 4 At some point in the 1960s or 1970s, the City built an office building on the property for its Gas Department. Known as the Gas Admin Building, it housed administrative functions of the Gas Department, but did not produce or distribute gas.
¶ 5 The subsurface of the property was undisputedly contaminated by the coal gasification activities in the late 1800s through the early twentieth century. In 1993, the United States Environmental Protection Agency (EPA) assessed the property and listed it as a potential environmental hazard. The EPA's preliminary assessment concluded, however, that the risks associated with the subsurface contaminants were minimal because (1) the surface areas of the property were covered by asphalt parking lots and buildings and (2) migration of the contaminants into the drinking water supply was unlikely. As a result, the EPA concluded that no further remedial action was required and de-listed the property.
¶ 6 By 2009, the Gas Admin Building was no longer in use and the City began planning for demolition of the two remaining structures on the property.[1] To that end, the City contracted with an environmental engineering firm to determine the location and extent of asbestos-containing materials. The engineering firm identified friable asbestos-containing materials in two areas of the Gas Admin Building.[2] The City then contracted with Hudspeth & Associates, Inc. (Hudspeth) to (1) demolish the remaining structures on the site, including asbestos abatement in the Gas Admin Building; and (2) backfill and *533 pave the areas where the two buildings stood. Demolition began in late 2012.
¶ 7 Smokebrush operated a health and wellness center on land neighboring the property. In March 2013, Smokebrush filed a complaint against the City and Hudspeth.[3] Smokebrush alleged that, as a result of the demolition activities, the individual plaintiffs had "breathed and continue to breathe contaminants contained in the airborne dirt and dust which migrate[d]" onto their property. Specifically, Smokebrush alleged that the demolition activities allowed airborne migration of "asbestos, heavy metals[,] and other toxic substances" onto their property and that, on one day, one of the individual plaintiffs "received a blast of wind and dust ... which covered her face and person." Smokebrush asserted a variety of tort claims and a claim for "equitable relief."
¶ 8 The City moved to dismiss Smokebrush's claims for lack of subject matter jurisdiction. Specifically, the City argued that it was immune from suit under the CGIA.
¶ 9 Smokebrush responded that the City's immunity was waived under the gas facility exception, § 24-10-106(1)(f), and the public building exception, § 24-10-106(1)(c). Smokebrush also argued, for the first time, that a subsurface plume of contaminants had leached onto its property over a long period of time.
¶ 10 The district court held a hearing to determine whether the City was immune under the CGIA. See Trinity Broad. of Denver, Inc. v. City of Westminster, 848 P.2d 916 (Colo.1993). The district court concluded that the asserted waiver provisions applied and rejected the City's argument that the CGIA could not be applied retroactively.
II. The CGIA Does Not Apply Retroactively
¶ 11 The English common law doctrine of governmental immunity developed based on "the historical fiction that the king could do no wrong, and thus, was free from legal accountability." Bertrand v. Bd. of Cnty. Comm'rs, 872 P.2d 223, 225 (Colo.1994). In 1895, the Colorado Supreme Court incorporated the doctrine into Colorado's jurisprudence. Id. ; In re Substitute for Senate Bill No. 83, 21 Colo. 69, 39 P. 1088 (1895), overruled by Bertrand, 872 P.2d 223 ; Bd. of Comm'rs v. Bish, 18 Colo. 474, 475, 33 P. 184, 184 (1893) ("The rule that counties are not liable for torts, in the absence of statute, is universally acknowledged."), overruled in part by Evans v. Bd. of Cnty. Comm'rs, 174 Colo. 97, 482 P.2d 968 (1971). No statutory waivers of governmental immunity existed. Bertrand, 872 P.2d at 225. Rather, the "general common law rule ... was immunity." Id. at 226.
¶ 12 In 1971, however, the supreme court prospectively abolished governmental immunity in a trilogy of cases. See Evans, 174 Colo. 97, 482 P.2d 968 ; Flournoy v. Sch. Dist. No. 1, 174 Colo. 110, 482 P.2d 966 (1971) ; Proffitt v. State, 174 Colo. 113, 482 P.2d 965 (1971). These decisions "also recognized that the General Assembly could reestablish governmental immunity by statute, if it desired." Springer v. City & Cnty. of Denver, 13 P.3d 794, 798 (Colo.2000).
¶ 13 The General Assembly accepted the invitation and enacted the CGIA, restoring governmental immunity, effective July 1, 1972. See DeLong v. City & Cnty. of Denver, 195 Colo. 27, 30 n.1, 576 P.2d 537, 538 n.1 (1978) ("In response [to the Evans trilogy], the legislature enacted the 'Colorado Governmental Immunity Act,' effective July 1, 1972."). In doing so, the General Assembly also carved out a limited number of circumstances in which it intended to waive governmental immunity. See § 24-10-106(1)(a)-(h). In light of the effective date of the CGIA, public entities essentially retained immunity before and after Evans, subject to the newly created statutory waivers.[4]
*534 ¶ 14 Some of Smokebrush's claims against the City relate to the undisputed contamination which arose from the operation of a coal gasification plant in the 1920s. Smokebrush nonetheless seeks the benefit of two statutory waivers effective in 1972. The applicability of a statutory waiver of immunity that did not become effective until decades after the City's coal plant ceased operations depends upon whether the legislature intended the CGIA waiver provisions to operate retroactively.
¶ 15 Colorado statutes generally do not apply retroactively and are presumed to operate prospectively. See § 2-4-202, C.R.S.2014; see also City of Colorado Springs v. Powell, 156 P.3d 461, 464 (Colo.2007). This proscription "prevent[s] the unfairness that would otherwise result from changing the consequences of an act after that act has occurred." Powell, 156 P.3d at 465. Though retroactive application of a statute is "generally frowned upon by both common law and statute," id. it is not presumptively unconstitutional. "Retrospective" legislation, however, is. Id. ; see Colo. Const. art. II, § 11 (prohibiting the General Assembly from passing retrospective legislation). "A statute is retrospective if it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." Powell, 156 P.3d at 465 (internal quotation marks omitted).
¶ 16 Deciding whether the CGIA waiver provisions operate retroactively is a two-step inquiry. Id . First, we determine whether the General Assembly intended the waiver provisions to operate retroactively. Id. Then, and only then, do we consider whether the challenged provisions are unconstitutionally retrospective. Id.
¶ 17 We need not proceed beyond step one. Nothing in the CGIA states that it is intended to operate retroactively. See § 24-10-101 to - 120, C.R.S.2014; Powell, 156 P.3d at 466 (where legislature makes substantive changes to the law, judiciary must find that the legislation operates prospectively unless the intent for retroactivity is clear). Had the legislature intended to waive governmental immunity for injuries arising from acts occurring prior to July 1, 1972, it would have plainly done so. It did not. Rather, it made the CGIA effective on July 1, 1972, evincing its intent that the CGIA and its waiver provisions not be applied retroactively. Because no contrary intention appears, we conclude the CGIA operates prospectively. See § 2-4-202.
¶ 18 Accordingly, to the extent Smokebrush's allegations are based upon contamination stemming from the City's coal gas operations in the 1920s and 1930s, the district court erred in concluding that the gas facility or public building exceptions to governmental immunity applied retroactively.[5] The City is therefore immune from tort claims based on such contamination.
III. Alleged Asbestos Contamination
¶ 19 To the extent Smokebrush also claims injuries from alleged asbestos migration during the demolition activities on the property beginning in late 2012, we next consider whether the district court erred in concluding that the City is subject to suit under the gas facility and public building exceptions to governmental immunity.
*535 A. Governing Standards
¶ 20 With limited exceptions, public entities are statutorily "immune from liability in ... tort." § 24-10-106(1). Absent an applicable exception waiving immunity, a court is without subject matter jurisdiction. See Corsentino v. Cordova, 4 P.3d 1082, 1086 (Colo.2000). The plaintiff has the burden of proving subject matter jurisdiction. Smith v. Town of Snowmass Vill., 919 P.2d 868, 871 (Colo.App.1996).
¶ 21 We review the district court's resolution of factual disputes for clear error. Tidwell v. City & Cnty. of Denver, 83 P.3d 75, 81 (Colo.2003). But we review a district court's interpretation of a statute de novo. Id . In doing so, we follow established principles of statutory construction, looking first to the statutory language and giving words and phrases their plain and ordinary meanings. Showpiece Homes Corp. v. Assurance Co. of Am., 38 P.3d 47, 51 (Colo.2001).
¶ 22 Because governmental immunity is in derogation of the common law, the CGIA's immunity provisions are strictly construed while its waiver provisions are broadly construed. Springer, 13 P.3d at 798 ; Walton v. State, 968 P.2d 636, 643 (Colo.1998). But if no express waiver of immunity has been granted, a court may not imply a waiver. Pack v. Ark. Valley Corr. Facility, 894 P.2d 34, 37 (Colo.App.1995).
B. The Gas Facility Exception
¶ 23 The legislature waived governmental immunity for injuries resulting from "[t]he operation and maintenance of any public water facility, gas facility, sanitation facility, electrical facility, power facility, or swimming facility by such public entity." § 24-10106(1)(f). Although the term "public gas facility" is not defined in the CGIA, the terms "public sanitation facility" and "public water facility" are. See § 24-10-103(5.5), (5.7), C.R.S.2014. Those terms are defined as "structures and related apparatus used in the collection, treatment, or distribution of" the specified utility. Id.
¶ 24 By placing the term "gas facility" in the context of other public utilities, the General Assembly expressed its intent to similarly restrict the definition of that term to include only facilities involved in the collection, production, or distribution of natural gas. See Jilot v. State, 944 P.2d 566, 570 (Colo.App.1996) ; see also Pack, 894 P.2d at 38 ("Statutes pertaining to the same subject matter must be construed in pari materia in order to further legislative intent and to avoid inconsistencies.").
¶ 25 At the Trinity hearing, evidence established that the Gas Admin Building was built in the 1960s or 1970s and remained on the property until it was demolished beginning sometime in late 2012. While the record is unclear about the specific functions performed in the Gas Admin Building, it is undisputed that it was not "a place where gas came in and they rerouted it to various locations." Indeed, no gas collection, production, warehousing, or distribution occurred on the property after the 1930s. Rather, the uncontested evidence established that the Gas Admin Building was used exclusively for administrative purposes. The record thus does not support the district court's finding that the Gas Admin Building was used for activities "related to the gathering, production[,] and distribution of natural gas."
¶ 26 Although the Gas Admin Building was owned by the Gas Department, the testimony established that its administrative function was, at most, ancillary to the distribution or production of gas. See Richland Dev. Co. v. E. Cherry Creek Valley Water & Sanitation Dist., 934 P.2d 841, 843-44 (Colo.App.1996) (water district's record keeping functions regarding the availability of water and sewer taps were ancillary to purposes of water facility); Pack, 894 P.2d at 37 (maintenance of a visitor's parking lot where the plaintiff was injured was ancillary to the purpose of a correctional facility and therefore was not part of the operation of the facility). We therefore cannot agree with the district court's conclusion that the Gas Admin Building was a "gas facility" within the meaning of section 24-10-106(1)(f). Thus, the gas facility exception does not apply.
C. The Public Building Exception
¶ 27 Governmental immunity is also waived for injuries resulting from a dangerous condition *536 of a public building. § 24-10-106(1)(c) ; Springer, 13 P.3d at 796. To establish a "dangerous condition," a plaintiff must show that his injury resulted from (1) a physical condition of a public facility or the use thereof; (2) which constituted an unreasonable risk to the health or safety of the public; (3) which was known to exist or should have been known to exist in the exercise of reasonable care; and (4) which was proximately caused by the negligent act or omission of the public entity in constructing or maintaining the facility. § 24-10-103(1.3) ; Springer, 13 P.3d at 799.
¶ 28 The district court found that the alleged airborne migration of the asbestos contaminants to Smokebrush's property "resulted from the construction or maintenance (including the demolition) of the public buildings" on the property. And the court found that the alleged migration of the asbestos contaminants "onto a neighboring property constitute[d] an unreasonable risk to the health or safety of the public, which dangers were known to the City or through the exercise of reasonable diligence should have been known to the City."
¶ 29 The City acknowledges that the Gas Admin Building contained friable asbestos-containing materials.[6] And the City does not question that exposure to airborne friable asbestos for a sufficient period is a health and safety risk. See, e.g., Pack v. Artuz, 348 F.Supp.2d 63, 79 (S.D.N.Y.2004) ("The health risk posed by friable asbestos has been acknowledged by various courts...."). Thus, the record supports a conclusion that a physical condition of the Gas Admin Building, known to the City, could, under the right circumstances, constitute an unreasonable health and safety risk.
¶ 30 But that conclusion does not resolve the question of whether the public building exception applies. Two questions remain. First, was the Gas Admin Building "public" within the meaning of the CGIA? And second, if so, was the City "constructing" or "maintaining" the Gas Admin Building when the asbestos allegedly became airborne as a result of the demolition of the building?
¶ 31 The first question is straightforward and we answer it in the affirmative. To the second question, however, we answer "no."
1. The Gas Admin Building Was "Public"
¶ 32 The City appears to concede that the Gas Admin Building was "public" within the meaning of section 24-10-106(1)(c). And the district court's finding on this point is supported by the record. Though it is unclear exactly what functions took place in the Gas Admin Building, the building was the site of the administrative operations of the City's Gas Department. Because no evidence suggested that these operations did not serve and benefit the public with respect to the City's provision of gas service, we conclude that the district court correctly found that the Gas Admin Building was "public." See Daniel v. City of Colorado Springs, 2014 CO 34, ¶ 17, 327 P.3d 891 (parking lot qualified as "public" because it operated for public benefit by providing visitors to a city clubhouse and golf course a convenient place to park their vehicles); Wisdom v. City of Sterling, 36 P.3d 106, 108 (Colo.App.2001) (water meter pit that is owned by a city, located on city property, and operated and maintained by the city, serves a public benefit).
2. The City Was Not "Constructing" or "Maintaining" the Gas Admin Building When the Asbestos Allegedly Became Airborne as a Result of the Building's Demolition
¶ 33 When the asbestos allegedly migrated to Smokebrush's property, the Gas Admin Building was in the process of being completely demolished. The dangerous condition definition applicable to the public building exception does not expressly recognize negligence claims stemming from demolition of a public facility. See § 24-10-103(1.3). The district court, however, concluded that demolition is included in *537 "constructing" and "maintaining" a public building. We do not agree that the plain language supports such an interpretation.
¶ 34 While the CGIA does not define "maintaining," it defines "[m]aintenance" as "the act or omission of a public entity or public employee in keeping a facility in the same general state of repair or efficiency as initially constructed or in preserving a facility from decline or failure." § 24-10-103(2.5). Maintenance "does not include any duty to upgrade, modernize, modify, or improve the design or construction of a facility." Id. And "maintain" is defined as "keeping a constructed edifice, structure, or improvement in the same general state of being, repair, or efficiency as initially constructed." Swieckowski v. City of Fort Collins, 934 P.2d 1380, 1385 (Colo.1997).
¶ 35 The plain meaning of "demolition" is "the act or state of demolishing" something. Webster's Third New International Dictionary 600 (2002). "Demolish," in contrast to "maintain," means "to pull or tear down (as a building)" or "to break to pieces or apart usually with force or violence." Id. That is, demolishing is fundamentally the opposite of maintaining.
¶ 36 To be sure, in some instances not at issue here, maintenance might require some limited demolition. For example, a repairperson might have to tear open a portion of a wall in order to maintain electrical wiring or plumbing. In such a circumstance, the demolition is temporary and part of the overall goal of keeping something in repair, that is, maintained. We do not agree, however, that the wholesale permanent demolition of a building is included in the plain meaning of "maintain," "maintaining," or "maintenance." Had the legislature so intended, it would have included such language in the definition of dangerous condition. Accordingly, "maintaining," as used in CGIA's dangerous condition definition, does not include the complete demolition of a public building.
¶ 37 The CGIA likewise does not define "constructing." We thus again apply the plain and ordinary meaning to the term. Dover Elevator Co. v. Indus. Claim Appeals Office, 961 P.2d 1141, 1143 (Colo.App.1998). We note first that, in defining dangerous condition, the General Assembly chose the verb "constructing" rather than the noun "construction." "Construct" is defined as "form, make or create by combining parts or elements" and "build" or "fabricate." Webster's Third New International Dictionary at 489. And in the context of analyzing whether a student's injury was the result of governmental negligence associated with constructing a school building, the supreme court construed the term "constructing" to include a building "as originally constructed but also ... permanent or temporary alterations ... made during its ensuing lifetime in service to the public." Padilla v. Sch. Dist. No. 1 in City & Cnty. of Denver, 25 P.3d 1176, 1182 (Colo.2001) ; see also id. at 1182 n.5 (setting forth dictionary definitions of "construct" and "construction"). Because we must presume that the legislature meant what it clearly said, we cannot conclude that the term "constructing" also encompasses "demolishing."
¶ 38 The Gas Admin Building was completely razed, effectively ending its "lifetime in service to the public." Id. at 1182.[7] During its demolition, nothing was "formed," "created," or temporarily or permanently "altered" to allow continued public service. Thus, the district court erred in concluding that the public building exception applied to the alleged asbestos migration resulting from the demolition of the Gas Admin Building.
IV. Conclusion
¶ 39 We reverse the order denying the City's motion to dismiss and remand to the district court with instructions to grant the motion.
Graham and Sternberg* , JJ., concur

The complaint alleges that there were three buildings on the property at the time of the alleged injury: the Gas Admin Building and two warehouse buildings. The record supports the conclusion that there were two permanent structures on the property, the Gas Admin Building and a cinder block structure. At oral argument, counsel for Smokebrush indicated that he used the term warehouse building interchangeably with the Gas Admin Building. We therefore conclude that the cinder block structure is not at issue in this appeal.

Friable means "easily crumbled or pulverized." Webster's Third New International Dictionary 910 (2002). In the context of asbestos, the term friable refers to small particles or fibers that are subject to inhalation.

Hudspeth is not a party to this appeal.

The Evans trilogy expressly abolished governmental immunity "prospectively" except as to the parties in Evans and its companion cases. As to everyone else, governmental immunity remained in place and, with the exception of the limited waivers to immunity created in the CGIA, was largely unchanged. Evans v. Bd. of Cnty. Comm'rs, 174 Colo. 97, 106, 482 P.2d 968, 972 (1971) ("Except as to the parties in this proceeding and in the two contemporaneous proceedings the ruling here shall be prospective only and shall be effective only as to causes of action arising after June 30, 1972.").

While we recognize that, in some cases, common law exceptions to governmental immunity existed, the burden to demonstrate such an exception rested with Smokebrush. See Tidwell v. City & Cnty. of Denver, 83 P.3d 75, 85 (Colo.2003) ("[W]here a plaintiff has sued a governmental entity and that entity interposes a motion to dismiss for lack of jurisdiction, the plaintiff has the burden of demonstrating that governmental immunity has been waived."). The district court, however, incorrectly shifted the burden to the City to demonstrate that no common law exception to immunity existed. And, at any rate, Smokebrush relied on the statutory waivers in the CGIA. It did not allege a common law exception to the City's governmental immunity for torts arising from the operation of the gas plant in the early twentieth century.

The City instead argues that when the alleged "asbestos tainted wind gust" occurred, the Gas Admin Building had already been demolished. It follows, the City asserts, that there simply was no building at the time of the alleged injury. The record, however, does not clearly establish when the active demolition was completed.

Because the issue is not before us, we express no opinion on whether governmental immunity might be waived under section 2410-106(1)(c), C.R.S. 2014, for an injury occurring during the demolition phase of a related construction project for a new public building.

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S.2014.